The opinion of the court was delivered by
Miller, J.
The plaintiff seeks to make defendant liable for the value of his sugar onboard of a barge sunk with its cargo, by coming in contact with a cluster of piles or fenders placed by defendants in Berwick’s Bay to protect the railroad bridge of defendants, constructed across the bay near the place of the loss.
The sugar was intended for transportation on the railroad, and the barge was used by the defendants to convey the sugar from plaintiff’s plantation to the bay, to be placed on defendant’s cars. The petition charges the cluster of piles to be an unlawful obstruction to navigation, constructed so as to be dangerous to vessels, the cause of the loss, and hence that defendants are responsible. The defence is that this fender or cluster was necessary to protect the railroad bridge from the strong current and drift wood which, but for the fender, would form rafts, sweep with .violence against the bridge; that the bridge was laid across the bay under the authority of a legislative act, and that the’ cluster or fender as a protection to the *1457 bridge was within the scope of this legislative authority. • The answer also avers the method of barge transportation of the sugar to the railroad was proper, charges the loss was due to a peril of navigation, not to the fault or negligence of defendants’ employees. The answer invokes the benefit of the stipulation in the bill of lading, given for the sugar, exempting defendants from all responsibility, and the defendants, it is claimed, are besides protected from liability, the legislati n of Congress limiting responsibility of owners of ships, barges and vessels engaged in navigation. From a judgment against him plaintiff prosecutes this appeal.
Under the legislative act, the defendants laid their bridge from the eastern to the western side of Berwick’s Bay (Act No. 87 of 1877), locating the draw nearer the western side to avoid the-deeper water and stronger current of the mid-channel, the draw occupying a space of over one hundred feet. There is piling faced with boards placed at some distance from the bridge piers, and extending about one hundred and fifty feet up on the western side of the bay; on the other or eastern side of the bay, on a line with the bridge piers or current line, is a cluster of eight piles, extending up, with cribbing between them, to prevent obstructions; the piles are braced with stringers tied with heavy iron plates, and the ends of the braces or stringers project beyond the piles, in order, it is testified, to take the bolts. These piles on the eastern side, we gather from the testimony, are not boarded so as to make a beard fender, as on the western side. This cluster or fender of eight piles begins twenty-two feet from the bridge and extends twenty-one feet up the bay. The board fender on the western side and the pile cluster on the east side thus form the entrance through which vessels pass to go through the draw. It is in evidence the board fender is not parallel to the current but extends at an angle from the bank. The current runs obliquely across the entrance directly toward the piling on the eastern side. This piling, it is in evidence, diminishes the room the boat would otherwise have to “swing” into the draw, and subjects the vessel to the necessity of turning and going through the draw obliquely instead of a straight direction. In adapting the boat to this oblique course, requiring backing sometimes, the current is apt to carry the boat on the pile cluster on the east side and on the projecting ends of the stringer in the position to strike and penetrate the hull. It was one of these stringers that pierced the barge about twenty- *1458 five feet from the bow and caused the loss'of the barge and plaintifl’s sugar.
We do not find it necessary to discuss the question whether the act of 1877 authorizes the piling in the bay or the question of the necessity of thus protecting the bridge. In any view of the authority conferred, it was certainly imperative on defendants in piling the bay, to use all precautions for the security of vessels. Wood on Nuisances, Secs. 472, 473. We think in view of the course vessels were obliged to adopt in approaching the draw, and the current to which they were exposed setting toward the east piling, it was the dictate of prudence to cover the ends of the stringers of this east side piling or adopt some other method of protecting vessels from that danger that proved fatal to the barge. On the one side there was a board protection, against which if a vessel struck it glanced, and there was no damage; on the other, where the danger was greater, there were the naked protruding heavy stringers to receive and destroy any vessel drifted on them by wind or current.
We have given due weight to the testimony why the boarding on the one side was not used as a protection on the other, but it is our conclusion that some precaution should have been employed against a peril so obvious in its character. On this question we are, of course, influenced by the testimony of a number of pilots and others familiar with the subject. One describes the process by which vessels were constrained to go through the draw; that is, the boat had to be laid diagonally across the current to go through; when the current was strong had to “ back up ” and flank to go through. “If the boat runs through without backing, have to go diagonally to open the bridge.” Another witness, a master navigating the bay for eight years and thoroughly familiar with the locality aud of the method of going through the draw, compulsory in all by the current, the position and construction of the piling, testifies: “The piling on the upper side is forty-five feet above the draw; it is a fender to protect the bridge; is dangerous; a boat always hits it; it is braced with stringers projecting eight or ten inches beyond it, and a boat going down strikes the stringers instead of the piling, which will penetrate the hull unless she has guards; all the trouble is in these braces; if they were protected the vessel would strike and glance off; the cluster makes navigation dangerous.” Another witness, a pilot for eleven years in the bay, testified: “There is a boarded fen *1459 der, one hundred and fifty feet long, on the west side, not parallel with trend of current, extends at an angle from instead of curving to the bank, causes current and obstructs navigation to extent of one-third of opening; on the east side is a clump of piling, eight strapped together, with iron at top, with each being bolted at water’s edge, is placed directly in trend of current; is an obstruction because west bank fender extends into instead of opening out to current; the cribbing is treacherous, sometimes below water line; in clearing end of west bank fender a boat is brought directly in trend of current, carrying it directly on piling; danger also results from large bolts, owing to wear of cribbing left projecting.” Another testified, a pilot of fourteen years’ experience: “The piling is well strapped with iron and cross timbers, which makes it dangerous for any barge or other boat to strike it. The current runs obliquely across the entrance to the draw. The piling is especially an obstruction to towing barges. ■ It is situated about forty feet from the bridge, and cuts off the room a boat would otherwise have to swing into the opening. The current runs directly toward the piling, the timbers of which stick out from it at the water’s edge, and would penetrate any boat striking them. The passage should never be attempted at night.” William H. Cisna says he has been a master and pilot for nine years in these waters. “The trend of the current is toward the east. If a boat were to strike the piling it would prove fatal to her, because of the bolts and other projections sticking out, below the water. If it were not for the piling a boat could drive straight through the draw with a tow, but as it is now a boat has to turn and go through obliquely. If there were no projections a boat might strike the piling without injury, but as it is now the least blow against the piling is apt to be fatal.” B. N. Hamilton a master and pilot of seven years’ experience, says the piling is undoubtedly an obstruction. “This is due to the position of the west bank fender, with reference to the trend of the current, which strikes it at an angle, which compels a boat to go into the draw obliquely — that is, with her head- toward the west bank. Even in this position the boat flanks so that she has to be swung quickly to the port when in about the middle of the draw, to prevent her striking the piling on the east side. If a boat strikes the piling she is almost sure to go down, because of the rugged spikes or bolts stick *1460 ing out. Everything that has ever bee.j sunk has been sunk on this piling.”
In answer to this testimony, it is urged that there have been in years only two or three boats lost on this piling. That illustrates, we think, good fortune, and the good care exerted by barge men and pilots. But it is none the less true that the danger depicted by the witnesses existed and proved effective to cause the loss in this case. We think if the. navigation of public waters is made dangerous by the omission of reasonable precautions on the part of those authorized to construct a bridge over such waters, the law places the responsibility for the resulting accidents to vessels on the bridge owners, unless they can refer the loss to some cause other than the perils they create. We find a case illustrating this liability in 6 McLean, 70.
The defendants have offered testimony to show that if the piles had not been in the way the barge would have struck the bridge. It might have been so, but we can not, on that assumption, relieve defendants from liability. The piles begin some distance from the bridge. That obstruction against which the barge struck can not be put out of view and another cause of loss, i. e., the bridge forty-three feet away, substituted, on the theory it would have intervened and proved equally fatal.
The defendants, as carriers of the sugar from plaintiff’s plantation to-the railroad, have invoked the protection of the limited liability legislation of Congress. Revised Statutes of the United States, Sec. 4282 et seq.; Acts of 1886,24 Statutes at Large, p.81; Acts of 1898,27 Statutes at Large, p. 445. If it be conceded barges are within the scope of these acts, it is difficult to make their application to this case. The loss is not charged to any neglect or want of care of those on the barge or the steamer. That issue is not in the case, but eliminated by pleadings and proof. The master of the steamer testifying, attributes the loss to wind, or the current bearing the barge on the pile cluster. His testimony makes more conspicuous the danger to navigation arising from piles, with projecting stringers to pierce the sides of vessels, placed by the defendants in the current, which, by reason of the constructions of defendants, all vessels, to pass through the draw, had to encounter, bearing them directly on these dangerous and, in this instance, fatal stringers. Neither wind nor current could have produced any loss in this case, if this pile cluster, with its projecting points, had not been in position, against which no vessel, *1461 according to the testimony, was safe, if drifted on them. The loss then, can not be referred to the perils of navigation in the sense of the limited liability act, unless we are to understand the term as including the danger produced by defendant; nor can the loss be attributed to the fault or want of care, neither alleged nor proved, of those in charge of the barge or steamer. The limited liability legislation protects owners of vessels against losses from the irresistible violence of the winds and waves, or arising from any want of care, without the design, privity or neglect of the owner, or those in charge of vessels. In our view the legislation has no applicability in this case of loss due to the method in which the defendants construct d the pile cluster, placed by them in the bay and endangering its navigation.
Our Code does not impose on carriers the responsibility incident to the relation under the common law. Civil Code, Arts. 2751, 2794. It is insisted the Code is to be the test of the liability of the depth. But we do not understand that the Code has any tendency to relieve the carrier, if the loss is due to his act in placing obstructions in rivers or waters without the care requisite to guard against accidents. On this same line of defence we are referred to the stipulations in the bill of lading furnished b3’’ the carrier to plaintiff. That the carrier may, under certain restrictions, modify his liability is undoubted. It is hardly necessary to go into that discussion. The whole subject, with all of its qualifications, has undergone careful examination. See Wheeler on the Law of Carriers, p. 31; Railroad vs. Lockwood, 17 Wallace, 361. But it is presumed it will be accepted no stipulation will avail against a loss due to the negligence or imprudence of the carrier, or, in other words, he can not stipulate against a peril produced by himself. We have considered, too, the defence that the plaintiff was familiar with the mode of transportation and took all risks. We think it a more reasonable conclusion that he supposed defendants assumed the risks arising from the position on which they chose to place the pile cluster and its method of construction disclosed by the record. The assumption of such risks, if even known to plaintiff, would, it seems to us, require express proof.
We have given careful attention to this contention in all its phases. Some of these pressed by plaintiff have been passed over. Assuming that these pile structures are authorized under the legis *1462 lative act as necessary to the bridge itself, notwithstanding the strict construction such acts usually receive (see 125 U. S. 26), it seems to us beyond dispute that the obligation of careful location and construction in respect to their structures was on the defendants. Guided by the testimony, we are led to the conclusion the mode of construction of the structures was dangerous and caused the loss. This phase we encounter at every turn of the case, and controls the decision.
It is therefore ordered, adjudged and decreed that the judgment of the lower court be avoided and reversed, and it is now ordered, adjudged and decreed that plaintiff recover from defendant the amount claimed in the petition, two thousand eight hundred and sixty-eight dollars, with legal interest and costs.
Mr. Justice Breaux concurs in the decree.