On the Merits.
Plaintiff claims the value of two cars of rice, valued, plaintiff alleges, at $2,326.50 net.
Plaintiff charges the destruction of the property to the negligence or want of care of the Southern Railway Company.
The following is an excerpt from the bill of lading:
“This company or other carriers over whose lines the property may pass shall not be held responsible for loss or damage (unless to prove carelessness or negligence of their employés) resulting from the leakage of oil, and so forth; nor for loss or damage to any article resulting from heat, cold, fire, flood, storm, mobs, or other causes not subject to carrier’s control. Neither this company nor any of its connecting carriers shall be liable for any damage to or destruction of said property by fire, unless such damage or destruction shall result directly and exclusively from their negligence or that of their employés, and unless such negligence shall be affirmatively established by the owner of said property." (Italics ours.)
Plaintiff’s contention is that the clauses of the bill of lading before cited place upon defendants the burden of proving that the destruction of the property was due to accidental and uncontrollable causes, and that it was impossible to prevent the loss, and that they are not- chargeable with any act of negligence. This contention will be considered later.
There is no dispute about the value of the rice, but the defendants deny their liability for the loss of the rice as charged.
The rice and the cars were destroyed in the old Hamburg (S. 0.) yards of the Southern Railway Company near Augusta, Ga., on the afternoon of the 26th of August, 1908.
One of the defendants sued — that is, the New Orleans & Northeastern Railroad Company' — denied that plaintiff has a cause of action; the other defendant, the Southern Railway Company, urged that it is protected by a bill of lading in which it is stipulated that it would not be liable for property destroyed by accident or uncontrollable force. Many of the issues are of fact.
The yard clerk at defendant’s yard, Hamburg, S. C. swore that on the morning of August 26, 1908, he received car 12406 and car 15545 from the Georgia Railroad. They are the cars which were afterwards destroyed. He had them placed in a train of cars which was being made up for Charleston. The moving from a safe place to the Hamburg yard must have been previous to 6 o’clock, for he informs us that he “knocked” off work at 6 o’clock a. m. on the morning of August 26th. “The rise [on that morning] was very rapid and unexpected.”
Another employé, an inspector, Southall, swore that the cars referred to were received from the Georgia Railroad on August 25, 1908; that two of the ears — the cause of the accident — contained quicklime.
The question suggests itself: Why make up a train, with two ears of lime (after the high-water mark warning), in the lowest •part of defendant’s yard? This witness further swore that he never had seen, the water as high, except in the freshet of 1888, so that, according to this testimony, the rise was not entirely unprecedented.
An1 employé, Norris, inspector, swore that these two cars loaded with lime were received on August 24, 1908, and transferred to the general freight yard.
One bill of lading was dated August 22, 1908, and the other August 24, 1908. Al *638 though shipped on different days they were both at Augusta at the same time.
The cause of the delay of these ears in Augusta is not explained.
The yardmaster for the Southern Railway Company, at Hamburg, S. C., testified that the condition of the yard was normal; that the yard was in his charge from 7 o’clock a. m., and that the switch foreman was in charge at night; that there was a full crew during the day and a full crew at nigbt, and one engine from 12 noon to 12 midnight; that he received a message from the superintendent on .the evening of August 25th that the indications were that there would be a rise in the Savannah river. Until 12 o’clock that night this witness said the river ' was not out of its banks, and there were no indications of a serious rise; that, when he went on duty at 7 o’clock a. m. of August 26th the river was rapidly rising, and in 35 minutes it had risen so rapidly that it covered a switchstand; that when he came on duty he saw that the river was rising, and he took an engine and tried to reach the cars. On the main track to old Hamburg there were three trestles, and one of these trestles was undermined by the rapidly running water, so that he could not get the engine over the trestle to reach the cars; that he moved all other cars to high ground, and weighted down the main trestle with cars, and one trestle in the old Hamburg yard also; that altogether 37 cars were destroyed in the old Hamburg yard by fire, caused by the water reaching a car of lime and slacking the lime and setting fire to the cars; that the cars in the Hamburg yards were made up into trains to be moved on the order of the inspector; that people living in Augusta for years did not anticipate the unprecedented rise; that a number of buildings were ruined, and others were destroyed by fire; that in the freshets several men were drowned in trying to escape from one of the buildings; that he had seen the river rise several times previous to August 26, 1908, and witnessed heavier rains, but had never seen the river extending over its banks, and he had never seen the river rise into the yards previous to August 26, 1908. He states that the car of lime, to which he has before alluded, took fire at 5 o’clock p. m. on August 26,1908. The water had reached the car before that time, but the lime with which it was loaded was slacking and did not ignite before 5 o’clock p. m. on the 26th of August.
The switchman of the Western & Atlantic Railway Company at Atlanta swore that on the 25th, 26th, and 27th of August, 1908, he was working for the Southern Railway Company at Augusta, Ga.; that the old Hamburg yard was submerged by water to ¿a. height which put the water several feet in the freight cars which were standing in the yard; that he had been living in Augusta, Ga., for about 20 years, and had never seen the river as high, and that there was a rapid current in the Hamburg yard; that, while he has no record of the previous high water, the flood of 1908 was by far the highest and most destructive that he had ever seen. He reported for work at 7 o’clock in the morning of August 26th, and he and others reached the Hamburg yard about 20 minutes after 7 o’clock a. m., and that upon reaching the yard they had to get off the main line onto a side track in order to let a, passenger train go by. It seems that even at that time passenger trains could run over the tracks. Witness further states that at that time the tracks were under water, and in order to get to the old Hamburg yards, where the cars were, they had to change two switches; that this necessitated the cleaning out of sand and mud from between the rails and consumed some little time; that they then proceeded to the old Hamburg yards for the purpose of pulling out the ears; that in *640 order to do this, they had to pass over three trestles; that when they passed the trestle designated as the “scale trestle” it sunk down 6 or 7 inches, showing that it had been undermined, and that when they passed the next trestle and pushed the tender upon it, it went down 10 inches; that they were afraid to go any further; that they were all on the top of the tender at the time, ready to jump off if the engine turned over; that, as they could proceed no further, the engineer jumped in his cab and stopped the engine; that they then returned, and in passing the scale trestle they noticed that it went down further than when they passed the first time; that then they pushed three gravel cars on the scale trestle to hold it down and keep it from floating away; that the other trestles had floated away; that he remained working in the yard until 11 o’clock; that the water was high and the current strong so that'they could do nothing to save the freight; that they did not at any time think the water would rise sufficiently high to get into the freight cars; that he had to return to his home to see to the safety of his family; that the floor of his home being under water, he had to remove his furniture to the second story; that the water rose rapidly and suddenly. He also mentions that the cars destroyed were located on tracks Nos. 1 and 5 in the old Hamburg yards, designated on the old blueprint.
We are impressed by the fact in all this that the attempt at rescuing property was only made after 8 o’clock in the morning of August 26th.
Henry P. Tyler, inspector, said:
“The old Hamburg yards were submerged by water on the 26th and 27th of August, 1908. The water rose about 6 feet in the yards. There was a strong current, caused by the lumber, trees, and driftwood, which were banked up against the railroad trestle to a height of about 6 feet. There were two trains of freight cars in the yard, ready to go out. When they discovered the fire in the cars, they endeavored to find a boat. Telephone communications,” he said “had been abandoned, as the line by the rise of the water could no longer be used, and they had to wait until some one happened to come within hailing distance in a boat. After a time they did find a boat. He and three others rowed out to the train of cars that were burning and put out the . fire by throwing-buckets of water on them. They stopped the fire just before it reached a car load of sheep and saved them. There were logs, wood, and timber floating in the current. He was upon the trestle of the Hamburg yards about 8 o’clock a. m. of August 26th, and helped to move_ away the drift, so as to try and keep an opening under the trestle to let the current flow through. This was before he went in the boat to help put out the fire in the freight cars.”
The inspector for the Southern Railway Company, Mr. Benson, testified that on August 25, 1908, there was no water in the Southern Railway Company’s yard at Hamburg; that on the morning of August 26 th he reported for work at 7 o’clock, and at that time the water had just reached the rail in front of the block office, and from then on the water rose at an increasingly rapid rate until it finally reached a height of 5% feet in the yard, with a rapid current flowing through. He was employed at this place as early as 1888. During the freshet that year (1888) the water ran over the yard; that the current was not as strong in 1888; that the river was higher in 1908 than in 1888; that the overflow was unprecedented; that at half past 8 o’clock on the morning of - August 26th he saw Engineer Dent, with his crew, try to reach the cars which were stationed on tracks Nos. 1 and 5 in the old Hamburg yards; that when the tender of the engine was pushed upon the scale trestle he saw it sink several inches, and a few minutes later he saw them abandon the effort to reach the cars in the old Hamburg yard; that about 2 o’clock in the afternoon a fire broke out in one of the ears; that they could not go to the rescue of these cars, because they had no boat; that the next morning they found a boat, and that he and three other men rowed to the cars and stopped the fire.
*642 Over 20 witnesses have testified. For that reason, we will endeavor to abbreviate from this on.
All witnesses agree in stating that the Hamburg yards were dry and free of water on the 25th of August, 1908. Several of the witnesses reported to work at about the usual hour (7 o’clock). Some formed part of the crew, and the other employés at other occupations in and about the yards. Why did they not make a serious attempt to move the cars on the morning of the 26th when they reported for work?
It also appears that the cars containing plaintiff’s rice were taken to the Hamburg yards about 1 o’clock on the morning of the 26th of August, 1908.
The question arises: Why was it that they put the cars in the low old Hamburg yards after they had received warning of the coming flood?
On the 26th of August, 1908, there was some delay in the movement of the engine in order to allow a passenger train to pass, and one of the witnesses testified that about this time the rails and switches in the Hamburg yards were covered by water, and, in order to get to the tracks, upon which the loaded freight cars were standing, it was necessary to change switches.
The night operator testified that he worked as night operator from 11 o’clock p. m. on the night of the 25th until 8 o’clock on the morning of the 26th of August, 1908; that he received a communication on the night of the 25th forecasting the height the water would rise. When he left .the office in which he was busy on the 26th, the water had risen about 2 feet in front of the blockhouse, and as far as he could see covered the tracks in the yards generally.
The superintendent, Hungerford, testified that on the 25th of August, the stage of the water of • the Savannah river was reported as 22 feet 3 inches on the gauge of Augusta, and that a report was issued from the Weather Bureau of a probable rise to a stage of 33 feet at Augusta; that on the morning of the 26th the Savannah river rose rapidly, higher than had been anticipated by the before-mentioned forecast; that by noon of August 26th, the river had reached a stage of 36 feet, continuing to rise and reaching a stage of 38 feet 8 inches about 2 o’clock a. m. on August 27th; that excessive rains fell in the northeast portion of the state from the 24th to the 26th and caused great damage by floods and the rapidity of the current. At 10 o’clock on the 26th, the gaugp registered 34 feet and 7 inches, and the river was rapidly rising. At that time a supplemental warning was issued by the Weather Bureau, placing the maximum stage at 38 feet by midnight.
The defendant contends that the water of the Savannah river was within its banks when the gauge was 33 feet. This is significant if the water was within the banks. There was no overflow up to that time on the 26th, and it follows that the cars could have been moved.
We infer that it rose, according to defendant’s theory, above its banks after the gauge rose above 33 feet.
The gauge of water, according to the last above mentioned witness, was 34 feet and 4 inches at 10 o’clock. From this it follows that the depth of water was 1 foot and 4 inches in the railroad yards; but previous to that, when the gauge was at 33 feet according to some accounts the river was not over its banks.
The yard conductor, C. W. Sykes, testified that the cars in question, in which the rice of plaintiff was, formed part of the train which was to leave for Charleston, {3. C. He says that he left the yards at 6 o’clock, went to breakfast, and came back to the office at half past 7 o’clock a. m. He worked in the office until 11. o’clock, and then *644 had to wade in water neck deep to return to his home. That was all he did. Not the least warning appears to have been given to any one in regard to the rising waters, of which he had received notice.
A close reading of the evidence compels the conclusion that there was not sufficient forethought on the part of the officers in charge of the railroad yards. We have seen that the river was rising rapidly on the morning of the 26th of August. Some of the witnesses testified that by 7 o’clock it 'had covered the switch tracks, and yet nothing was done to protect property. Leisurely enough, the employés went about their business and gave very little concern to the rising waters. Those who did attempt to save property (if what they did can be considered in that light) displayed very little activity, beginning at 8 o’clock, taking out a few cars and leaving others in the old Hamburg yards. That is all they did. These yards were submerged by water to a height above the floor of the cars. The question arises: Was it possible, before the waters reached their greatest height, to move the cars to a safer place than where they were hauled to on the morning of the 26th of August; that is, to the old Hamburg yards? We have noted, before 8 o’clock or 8:30 o’clock a. m., not the least attempt was made to move the ears out of the yard where they had been placed. Mr. Benson, inspector of the Southern Railway Company, testified that on the morning of the 26th of August, he reported at the Hamburg yard at 7 o’clock to go to work, and at that time the water had just reached the rail in front of the block office. There were a crew and an engine in the yard. Why were they not put at work at that time to save the freight?
Another witness, the night operator, renders it still more evident that it was possible to move the train in the morning, for he says that when he went to work the yard was entirely free from water on the 26th of August in the morning. An attempt was made to rescue the cars between 8 and half past 8 o’clock a. m. It failed. They went too late to rescue these cars. There had been ample time to save them.
The oral testimony leads to the inference (as well as the blueprint in evidence) that the old Hamburg yard is lower than the new yard. According to the blueprint in evidence, the water was quite above the rails of the tracks and rose into the cars, while at the yard and telegraph office it was only 5 inches over the rails. This was one of the reasons why they should have been careful not to run the cars into the old yard (the lowest place), after having received notice of the rise of the waters.
They should have gone to the old Ham-brag yard and put out the fire. This they did on the 27th when the waters were higher, as witness states, than they were on the 26th, and still they met no difficulty in extinguishing this fire.
One of the reasons given for not going to the 9ars on fire the day previous, as witnesses state was that they had no boat, and waited for a boat to come in hailing distance in order to cross over to the old Hamburg yard. It seems no boat came on the 26th. It does seem strange that near a city a boat could not be gotten on the first day. We do not infer that they were cut off entirely from the city, where there were boats.
The rise of the waters in the Savannah river over its banks was not entirely unprecedented, although the rise of 38 feet and 8 inches was. Had preparations been made to meet the usual rise, the result would have been different.
Prom the following, it is made evident by the records of four of the floods, indicated by the asterisks infra, from the year 1888 to and including the year 1902, the waters by which Hamburg was visited, were higher than they *646 were on the morning of the 26th, when the defendant made an attempt at rescuing cars:
Year. Date. Height.
1888 September 11. *38 ft. 1% in.
1891 January 15. 29 ft. 5 in.
1892 January 11. 30 ft. 6 in.
1894 April 6. 29 ft. 4 in.
1S95 February 8. 31 ft. 0 in.
1896 April 4. 21 ft. 3 in.
1897 March 9. *35 ft. 5Vs in.
1S98 October 11. 27 ft. 9 in.
1892 July 10. 30 ft. 3 in.
1900 September 3. 28 ft. 5 in.
1901 February 14. *32 ft. 8 in.
1902 March 1. *34 ft. 7 in.
Other years between 1888 and 1908, than those above noted, the rise was not over 27 feet.
These floods were frequent, and yet defendant remained indifferent, and even sent its cars to the lowest places on the yard, where they were permitted to remain without making a serious and timely attempt to take them away.
From all this evidence we are led to the inference, which we think is positive, that there was negligence. A little timely activity would have brought about a different result, and would have saved plaintiff’s property, or would have placed defendant in a position to successfully defend itself.
Unquestionably the river was rising rapidly on the morning of the 26th at 7 o’clock; in 35 minutes it covered the switch tracks. It does not seem that anything was done to prevent the destruction of the cars. Leisurely enough, the employés went about their respective occupations, and now, when they give an account of themselves, it does seem as if they wish to lay all the trouble on the rising waters, although they remained indifferent when they should have exerted themselves.
From the first there is evidence that the trestles were unsafe, prematurely weak, so much so that early in the rise they were washed away. Trees and lumber were allowed to bank up as they drifted down against these trestles. Nothing was done to relieve the situation at this point, although trees were pressed down the current, passing under and undermining the trestles. A former employe came to the place and saw the danger. He moved away the banked-up débris as well as he could, though he was not in the employ of the defendant. When asked why he had worked as he had, his reply was that he wished to help the companies. He, the former employé, worhed to save property, but the railroad people did nothing to move away this obstruction. The employés were not as mindful of the necessity of taking care of freight as they should have been. They thought, it may be, that the waters would not rise sufficiently high to get into the freight ears. In this they assumed too much. The reports received in regard to the flood did not justify that assumption. The cars were ready to be hauled away. No one testified why they were not hauled to destination.
[3] In the first place, in regard to vis major: In regard to the evidence of the height of the water, the negligence charged, and the damages, and upon whom lies the burden of proof?
The Code (article 2754) clearly states that, in order to be relieved from liability, the carrier must prove “that such loss or damage has been occasioned by accidental and uncontrollable event.” (Italics ours.)
The law requires him (the carrier) to prove the uncontrollable event which he alleges. Civil Code, arts. 1923, 2219, 2232.
The following decisions are pertinent: Montgomery & W. P. Rice Co. v. Moore, 51 Ala. 394; McCarthy v. Louisville & N. R. R. Co., 102 Ala. 193, 14 South. 370, 48 Am. St. Rep. 29; Central R. R. Co. v. Hall, 124 Ga. 322, 52 S. E. 679, 4 L. R. A. (N. S.) 898, 110 Am. St. Rep. 170, 4 Ann. Cas. 128; Pittsburgh, C., C. & St. L. R. Co. v. Mitchell, 175 Ind. 196, 91 N. E. 735, 93 N. E. 996; Read v. Spaulding, 30 N. Y. 630, 86 Am. Dec. 426, *648 affirming 5 Bosw. (N. Y.) 395; Heyl v. Inman S. S. Co., 14 Hun (N. Y.) 564; Dunson v. New York C. R. R. Co., 3 Lans. (N. Y.) 265; Graham v. Davis, 4 Ohio St. 362, 62 Am. Dec. 285; Fentiman v. Atchison, T. & S. F. R. Co., 44 Tex. Civ. App. 455, 98 S. W. 939.
[4] But, as carriers are bound to some vigilance, if a little vigilance and forethought might have prevented the loss, the defendants are liable for the amount of the loss. They failed to prove ordinary care.
Under the French law, if the management, in case of an emergency on account of an accidental or uncontrollable event, is that of the father of the family, it is a complete protection.
Defendants’ managements were not of that character. They were not sufficiently prudent and cautious. There was a general rise of all the waters above; they saw the rising waters; it behooved them to give attention to the threatening condition.
[7] They invoke the forecast of the Weather Bureau; that this Bureau did not give notice of the highest rise of the waters within an inch. The forecast of extreme height was 38 feet, and the rise was 38 feet 8Y2 inches.
This complaint, directed against the Weather Bureau, is not a complete defense unless reasonable activity was brought to bear in due time. It was not. The railroad people were warned to better protect themselves against the accident.
There was unconcern. As evidence of this, we recall that the yard conductor, on the morning of the loss (from 7 :30 to 11 o’clock) worked around the office, and then went home.
There were an engine and crew in the yard; they were not timely called upon to prevent the loss, or, if called, it is not proven. It was an emergency; some concern ought to have been shown to prevent the destruction of the property. This is the impression created by the evidence; if it were different, if those in authority and those under their orders on the occasion were sufficiently active, the evidence on the subject is weak and not convincing. The emergency required a little more vigilance than usual. There was possibility of foreseeing things, and of moving in the direction of saving the property.
[8] As to the waiver in the bill of lading covering risks: It is some protection to the carrier, barring his own negligence. But, none the less, for loss occasioned by ordinary negligence, the carrier is liable notwithstanding an agreement. Insurance Co. v. Railroad Co., 20 La. Ann. 302.
If there is a special agreement, it will not ■ be a protection for the carelessness or unskillfulness of the crew. Roberts v. Riley, 15 La. Ann. 103, 77 Am. Dec. 183.
In another decision, it is decided that no waiver will be considered as exemption from liability from leakage occasioned by his fault or negligence of himself or his agent. Thomas v. The Morning Glory, 13 La. Ann. 269, 71 Am. Dec. 509.
Similar views are expressed in Darrall v. Southern Pacific R. R. Co., 47 La. Ann. 1455, 17 South. 884; Price v. The Uriel, 10 La, Ann. 413; Oakey & Hawkins v. Gordon, 7 La. Ann. 235; Van Horn v. Taylor, 2 La. Ann. 5S7, 46 Am. Dec. 558; Peters v. Railroad, 16 La. Ann. 222, 79 Am. Dec. 578; Frank v. Adams Express Co., 18 La. Ann. 279.
[5] On the rehearing only, the contention is that the suit is to be governed by the Carmack amendment (Act June 29, 1906, c. 3591, § 7, 34 Stat. 593 [U. S. Comp. St. Supp. 1911, p. 1307]) to the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, § 20, 24 Stat. 386 [U. S. Comp. St. 1901, p. 3169]), interpreted in the Croninger Case, 226 U. S. 491, 33 Sup. Ct. 148, 57 L. E'd. -. But if it is to be governed by. that decision, defendant would not be in much better position.
*650 We are not impressed by that view.
Admitting for a moment all that is claimed under the Carmack amendment, under any of tbe laws of this country, indifferent railroad people, who receive freight to be transported some distance, and who, just before tbe waters of a storm bave flowed down, stop tbe cars on tbe way, and run them to tbe lowest part of tbeir yards, and place them next to cars loaded with quicklime, easily ignited by water, and leave them at that place while other cars are taken out, and who make no attempt to haul them out, although tbe waters are rising slowly enough for such work after warning given, are not protected from the charge of negligence under tbe law. Tbe decision in Railroad Co. v. Reeves, 10 Wall. 179, 19 L. Ed. 909, cited by defendants, is not determinative of •the issues considered from any point of view. In this last-cited case, reviewing another decision,- the court, through Justice Miller, said, in substance, that the law requires some skill and forethought of carriers.
If judged from that point of view exclusively, the carrier is not excused unless he shows some activity in protecting property in case of necessity.
As relates to Adams Express Co. v. Croninger, 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed.-, on which reliance is placed: It does not appear that the rules of evidence have been changed 'by the interpretation laid down in that decision, so as to shift the burden and to have the effect of nullifying the Civil Code of this state upon the subject.
The amendment known as the “Carmack amendment” invalidates the provisions of any state law nullifying contracts limiting the liability of a carrier for loss or damage to the agreed or declared value. The amendment is silent about evidence. There is a great difference between the “agreed” value of freight, as set forth in the bill of lading, to be accounted for in case of loss, and the onus of proof in case of loss of freight.
To return for a moment to the Croninger Case, above, it appears that, under the laws of Kentucky, the contract limiting the plaintiff’s property to the “agreed value” gave rise to the question at issue. The federal Supreme Court held that the Carmack Amendment of the Interstate Commerce Act was controlling as relates to the value of property lost. The “value clause” is expressly referred to in the decision.
We annex a copy of the amendment in the margin,[1] containing all that there is upon *652 the subject in the federal interstate commerce law. Not one word expresses the intention of repealing the rule fixing onus of proof under state statutes.
There is no necessity of citing our decisions, as they uniformly hold that the onus is with the defendant, save two, as they are specimens of the others: Patton v. Pickles, 50 La. Ann. 857, 24 South. 290, and Spur-lock v. Traction Co., 118 La. 1, 42 South. 575.
The state law should undoubtedly stand as it is, as it is not in conflict with federal law or jurisprudence.
The burden was on the defendant to sustain the following allegation in its answer:
“Respondent avers that this happened without any contributory negligence on its part, and that the sudden and unprecedented flood, which could not have been anticipated, with the resultant fire, was the proximate cause of the destruction of plaintiff’s property. Respondent avers, further, that the cars were not unreasonably delayed, and that nothing could have been done by respondent which was not done to save the property.”
Defendant admitted the loss and averred that it did all it could.
It should have proven the averment.
The report of the Weather Bureau showed that the water had been rising steadily for two days, faster on the second than on the first day.
The Supreme Court of South Carolina, in Ferguson v. Southern Railway Co., has explained its views in a well-considered opinion relative to the same storm of August 24, 1906. See same title, 91 S. C. 61, 74 S. E. 129. We insert extract from that decision relating to this same flood:
“The rule upon which this case must be decided was stated thus in Slater v. Railway [29 S. C. 96, 6 S. E. 936]: ‘Where an act of God
causes injury to property in the hands of a common carrier, and such act is the sole cause of such injury then the proof of this fact is a perfect shield. But if there be any negligence on the part of the carrier, which, if it had not been present, the injury would not have happened, notwithstanding the act of God, the carrier cannot escape responsibility. And the onus is upon the carrier to show, not only that the act of God was the cause, but that it was the entire cause; because it is only when the act of God is the entire cause that the carrier can be shielded. * * * ,
“ ‘But the fact that such an accident as the one complained of had never happened before is not, of course, conclusive of the fact that there was no negligence.’ [21 A. & E. Ene. L. (2d Ed.) p. 489.] In volume 13 of the same work, p. 721, it is said: ‘An extraordinary flood is
to be classed among the acts of God which no human power can prevent or avert. Whether it will relieve the carrier from liability depends upon whether its results or natural consequences could, by the exercise of reasonable forethought and prudence, have been foreseen and guarded against. If the emergency was one that no human sagacity, guided by any of the known principles of human reasoning, could have anticipated, the carrier will be relieved. If, on the other hand, its effects might have been foreseen by the exercise of reasonable diligence and prudence,_ a.failure to so do would be negligence and subject the carrier to damages, although the original cause was the act of God.' And, on page 722 of the same volume, this rule is stated: ‘If the carrier discovers that goods
intrusted to his care are in peril of injury or destruction by a flood, then it becomes his duty to use actively and energetically all the means at his command, of which it might be reasonably expected that one engaged in such business would possess, to meet the emergency, and save the property from injury, and any neglect to use the means stated above, which prudent, skillful men in that business might ordinarily be expected to use in such an emergency, will subject the carrier to liability.’
“It requires no citation of authority to sustain the proposition that after a carrier has discovered, or by the exercise of reasonable prudence and diligence should have discovered, that goods in his possession are subject to the perils of an unprecedented flood, or other vis major, it is his duty to exercise reasonable care and diligence to save them from damage or loss. * * *
“Plaintiff’s goods were destroyed at Kingville, *654 which is a station on defendant’s road from Columbia to Charleston, and is the point of junction of that road with anothér road operated by defendant, running to Marion, N. C., via Camden and Yorkville, the destination ox plaintiff’s goods. Kingville is situated in the fork of the Congaree and Wateree rivers, which unite about seven or eight miles below to form the Santee. It is between three and four miles from the Congaree and from five to seven miles from the Wateree. It is in the edge of the swamp of the Congaree, and the land between it and each of the l'ivers is low, flat, swamp land, subject to inundation by freshets. The station is built upon made land, and the railroad tracks are raised several feet above the adjacent swamps by embankments and trestles. The rivers meet approximately at right angles. Just below their confluence, there is a high bluff on one side, and the highlands come down pretty close on the other, so that the swamp is narrow. Therefore in times of very high water in both rivers the passage is inadequate, and the waters are dammed up and thrown back in the swamp above.
“Besides the two lines mentioned, the defendant operates other roads in the state which pretty well cover the territory traversed by those rivers and their tributaries, which form the Congaree and Wateree, and it has along its road telegraph lines as a means of communicating intelligence as to conditions affecting the proper operation thereof.
“The United States government has a Weather Bureau at Columbia which co-operates with the railroads in obtaining and sending out information relative to the physical conditions which affect the operation of the roads. It maintains gauges at different places on the principal rivers, from which reports are sent in, and a record of them is kept. In times of high water in the rivers, flood warnings and bulletins giving information of the present and probable near future conditions are issued, and sent to those who are interested. Besides its ■ own sources of information, the services of this Bureau were at defendant’s command. Ordinarily, therefore, the defendant would be expected to keep its agents advised of the approach of floods of such magnitude as to cause apprehension of danger. The testimony shows that, in this instance, the defendant was advised of the conditions existing throughout the state on the streams tributary to the Congaree and Wateree; that it knew that, beginning about the 19th of August, rains had been continuously falling over the watersheds of these streams, and that, beginning about the 23d, they became unusual, both in quantity and in the extent of territory covered; so that, by the 24th, nearly all the streams in the upper part of the state began to rise, and on the 25th and 26th they had reached the flood stage. It was known that the floods in some of the larger of these streams were unprecedented in magnitude and destructive power. It was also known that they would surely find their way into the Congaree and Wateree. Defendant also knew the records of previous floods in these rivers.”
The court can take notice of this rise of the waters, particularly as it is the same storm that was felt in all parts of the state. Those occur from time to time in the Eastern and. Western states. In our level section of country we have not the same experience, except when the waters break through the levees of the Mississippi. A crevasse may illustrate:
If a railroad crew were to receive notice through the Weather Bureau that a crevasse such as the Himalaya was flowing at some distance above, and that the waters, would rise at a place below, and that the whole place would be submerged within a certain time mentioned, would it be thought good management if the railroad people were to remain indifferent, although they had ample means to save everything?
They saved a part of the property — moved some of the cars at the station where they had been placed, and allowed others to remain untouched. If they could so easily save a part of the property, why did they not save the whole?
For reasons stated, it is ordered, adjudged, and decreed that the judgment of this court, heretofore rendered, is avoided, annulled, and reversed.
It is ordered, adjudged, and decreed that the judgment appealed from is affirmed, except as to the date of interest, which will now begin to run from the date of the judgment, instead of from judicial demand. In all other respects, the judgment as amended (as to interest) is affirmed. Appellees to pay costs of appeal.
MONROE, J.
I adhere to the views expressed in the original opinion, and, for reasons hereafter to be handed down, dissent from those herein expressed. See 61 South. 722.

 “That any common carrier, railroad, or transportation company receiving property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass; and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed: Provided, That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law.
“That the common carrier, railroad, or transportation company issuing such receipt or bill of lading shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage, or injury shall have been sustained the amount of such loss, damage, or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof.”
The original Interstate Commerce Act of February 4, 1887, was extensively amended by Act June 29, 1906, c. 3591, 34 Stat. 584 (U. S. Comp. St. Supp. 1911, p. 1281).
The above amendment is an excerpt from the opinion ih Adams Express Co. v. Croninger.
The following are the dominant features of that account as found in the opinion:
First. It affirmatively requires the initial carrier to issue “a receipt or bill of lading therefor,” when it receives “property for transportation from a point in one state to a point in another.”
Second. Such initial carrier is made “liable to the lawful holder thereof for any loss, dam *652 age, or injury to such property caused by it.”
Third. It is also made liable for any loss, damage, or injury to such property caused by “any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass.”
Fourth. It affirmatively declares that “no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed.”
The foregoing relates to limitation as to value, not to negligence.
And, as to the difference, the Supreme Court of the United States said: “The limitation as to value has no tendency to exempt from liability for negligence.” Hart v. Pennsylvania R. R., 112 U. S. 331, 5 Sup. Ct. 151, 28 L. Ed. 717.