John Fentiman v. Atchison, Topeka & Santa Fe Railway Company.

Decided December 12, 1906.

**1.—Destruction of Goods—Liability of Carrier—Prima Facie Case.**

At common law a common carrier is liable as an insurer of goods intrusted to him for transportation, unless such loss was caused by the act of God, the public enemy, inherent defects in the goods, or negligence on the part of the owner. When it is shown that the goods were delivered to the carrier and were destroyed while in his possession, a *prima facie* case is made, which can only be rebutted by the carrier's proving that the destruction of the goods was due to one of said causes without any negligence of the carrier proximately contributing thereto.

**2.—Same—Question of Fact—Rebutting Evidence.**

Whether or not a *prima facie* case made by the plaintiff is overcome by the rebutting evidence of the carrier, however strong, is a question of fact which can be withheld from the jury only when the evidence in rebuttal is so overwhelming as to leave no room for a reasonable doubt in the mind of every man of ordinary intelligence.

**3.—Act of God—Delay in Transportation.**

It is the rule in this State that the negligent delay of a carrier in the transportation of goods can not be regarded as the proximate cause of an ultimate loss by act of God, although had the goods been transported with reasonable diligence they would not have been lost.

**4.—Same—Concurring Negligence.**

While one person will not be liable to another for a loss which the latter would not have sustained had there been no negligence on the part of the former, unless such negligence was the proximate cause of the loss, yet, if the negligence of the former concurs with an accidental cause, resulting in injury to the latter, the negligent person must answer for the consequences as though his negligence were the sole cause of the loss, provided such loss is within the probable consequences of the negligent act.

**5.—Act of God—Negligence of Carrier—Peremptory Charge.**

In a suit against a railroad company for the value of goods destroyed by flood while in the possession of the company, the defendant plead act of God, and the plaintiff replied that defendant had ample notice of the approach of the flood, and was negligent in not removing the goods to a place of safety. Evidence considered, and held to require a submission to the jury of the issue of negligence *vel non* on the part of the defendant company.

Appeal from the District Court of Bexar County. Tried below before Hon. Edward Dwyer.

*Geo. C. Altgelt* and *Aug. E. Altgelt,* for appellant.—There being evidence tending to prove that appellee by proper care might have avoided the destruction of appellant's goods, and evidence to show that it had

notice of the approaching flood sufficient to have kept plaintiff's goods away from the danger of the flood, as well as time sufficient in which to have removed the goods from the flooded district, it was a question of fact to be determined by the jury whether or not plaintiff's goods were destroyed by an act of God purely and unmixed with defendant's negligence—and the District Court accordingly erred in withdrawing the case from the jury and instructing a verdict for defendant. Gulf, C. & S. F. Ry. Co. v. Pomeroy, 67 Texas, 502; Missouri, K. & T. Ry. Co. v. Davidson, 60 S. W. Rep., 278; Missouri Pac. Ry. Co. v. China Mfg. Co., 79 Texas, 26; Ryan v. Missouri, K. & T. Ry. Co., 65 Texas, 13; Missouri, K. & T. Ry. Co. v. McFadden, 33 S. W. Rep., 855; Morgan v. Dibble, 29 Texas, 120; Houston & T. C. Ry. Co. v. Harn, 44 Texas, 628; Bibb Broom Corn Co. v. Atchison, T. & S. F. Ry., 69 Law Rep. Ann., 509; Smith v. Western Ry. of Ala., 11 Law Rep. Ann., 613; Wald v. Pittsburg, C. C. & St. L. Ry., 35 Law Rep. Ann., 356.

*J. W. Terry* and *A. H. Culwell,* for appellee.—The undisputed facts in this case show that the damage complained of was occasioned by reason of an act of God, to wit, an unprecedented flood while this merchandise was in the railroad yards in Kansas City, and though the proof might further show that by the exercise of ordinary care the shipment could have been moved out of Kansas City before the storm and flood, yet the appellee will not be liable because the proximate cause of the loss was the flood.

It makes no difference, so far as liability in this case is concerned, about the length of time the appellee consumed in handling this shipment into Kansas City because the facts show that the injury was occasioned by an unprecedented flood. International & G. N. Ry. Co. v. Bergman, 64 S. W. Rep., 999; Hunt Brothers v. Missouri, K. & T. Ry. Co., 74 S. W. Rep., 69; Gulf, C. & S. F. Ry. Co. v. Darby & Cauthen, 67 S. W. Rep., 129; Gulf, C. & S. F. Ry. Co. v. North Texas Grain Co., 74 S. W. Rep., 567; Galveston, H. & N. Ry. Co. v. Mistrot Bros., 68 S. W. Rep., 1117.

When the probative force of the evidence is not sufficient to do more than establish a mere surmise or suspicion of the existence of the facts sought to be established, it is deemed in law no evidence at all, and such at best is all that can be said of appellant's case. Murphy v. Galveston, H. & N. Ry. Co., 16 Texas Ct. Rep., 606; Joske v. Irvine, 91 Texas, 574.

NEILL, ASSOCIATE JUSTICE.—The appellant sued the appellee as a common carrier, to recover $1,255.01 damages for loss of his goods received by the company in Chicago, Illinois, to be transported thence and delivered to plaintiff in San Antonio, Texas.

The defendant answered by a general denial and pleaded specially that it received the goods on or about May 25, 1903, at Chicago for transportation to plaintiff at San Antonio; that in course of transportation the car in which the goods were loaded reached Kansas City, Missouri, and while upon the tracks of defendant in its yards at said city, the car was flooded with water by reason of an unexpected and extraordinary or unprecedented flood from the rivers and creeks near Kansas

City, and remained under water several days until the flood receded, and that the damage to the goods was caused by the flood; and that the damage complained of resulted from and was caused by the unexpected and extraordinary flood; and was the result of an act of God, for which defendant was not liable.

By a supplemental petition the plaintiff pleaded, that if the goods were destroyed by the flood as pleaded by defendant, it was through its negligence in exposing and permitting the goods to be exposed in the car to the danger of the flood; for that defendant had due notice and warning of the probable occurrence of the flood, by common rumor, observation and reports of the United States Weather Bureau at said time and place, whereby it was put upon notice of such danger, and it, therefore, became its duty to protect plaintiff's goods therefrom. That despite such notice and warning, which were publicly issued on the 26th, 27th, 28th and 30th days of May and June 1, 1903, and although its yards were threatened with such flood, defendant after receiving the goods at Chicago about May 26, 1903, and forwarding them to Kansas City where they arrived May 29, in apparent good order, at a time when said flood was imminent and it was generally known that the danger-point to the tracks in the yards of defendant had been reached by the flood, the defendant in disregard of its duty to plaintiff as a common carrier, permitted and caused the car containing the goods to be placed on grounds threatened by such flood and to remain there, although aware of the threatened flood, and negligently failed to remove the same from such place of danger. That the river bottom where the car containing the goods was placed had been inundated to the same or greater extent, which was common history and tradition, and the defendant, by the exercise of due diligence could have reasonably anticipated the flood and consequent damage to plaintiff's goods, and have provided against the same.

After hearing the evidence, the court, upon the request of defendant's counsel, peremptorily instructed the jury to return a verdict in favor of the defendant, which was accordingly done. From the judgment entered upon such verdict this appeal is prosecuted.

As the assignment of error complains of the peremptory instruction of the court, it becomes necessary for us to review the evidence upon the issues made by the pleadings, and determine whether, under the law pertinent to it, no other findings of fact can reasonably be deduced by ordinary minds than such as would clearly exonerate the defendant from liability for the destruction of the value of plaintiff's property.

It is not contended by defendant that plaintiff was not the owner of the property in question; and it reasonably appears from the evidence that it was of the value alleged, and that its value was wholly destroyed while in defendant's possession as a common carrier. The defendant received the goods from the Goodrich Transportation Company, a connecting carrier, at Chicago on May 26, 1903, in apparently good order, to be transported over its line of railway and that of the International & Great Northern Railway Company, a connecting carrier, to San Antonio, Texas, and there delivered to the plaintiff as consignee of the shipment. The car containing the goods, was, while on defendant's line of road, and in its yards at Kansas City, submerged by the flood hereinafter

described. The car containing the goods arrived at Kansas City May 29, 1903, and was forwarded thence to Florence, Kansas, July 7, 1903. The distance from Kansas City, Missouri, is 458 miles.

There are two rivers near Kansas City, Missouri, the Missouri and the Kansas or Kaw. The former comes in from the north side of the city and runs in a southerly direction. The other comes in from the west and flows in an easterly direction until reaching a point within 2,000 feet of the Kansas-Missouri State line, then flows in a northerly direction, until it empties into the Missouri River. There is also Turkey Creek near the city. It flows in a northwesterly direction and empties into the Kansas or Kaw near the stock yards. The yards and depots of appellee are near this river and several blocks south of the Missouri.

The yards and depots of appellee at Kansas City are about thirteen feet above the normal or ordinary water line of the Kansas or Kaw River and of Turkey Creek. Several days prior to May 30, 1903, the water of these streams rose gradually, until the morning of May 31, 1903, when the streams overflowed their banks and commenced to submerge the adjacent railroad yards and wholesale district of the city, and from the morning of the 30th of May to the morning of the 31st, the water rose about five feet, and during the day of the 31st four feet more, and on the night of the 31st of May and the 1st of June five feet additional, which submerged the business portions of the city from five to thirteen feet. The flood was from twenty-five to thirty feet above the normal flow of the water. With the exception of 1844, when the flood was as high if not higher than the one described, the highest record of an overflow up to 1903 was in 1881, when twenty-three feet of water above the city datum was reached, the flood of 1903 being thirteen feet and five inches above the record of 1881. The elevation of the Santa Fe railroad yards is about thirty feet above the city datum, and had never been overflowed prior to 1893, when the flood forced the water about seven feet above the tracks of the railroad and about eleven feet above the sidewalks of the streets in that part of the city. Appellee's road was submerged six or eight days.

The Weather Bureau at Kansas City, Missouri, made predictions and issued warnings in advance of the flood of 1903, but those predictions were not specific as to the probable height the flood would reach, the bureau not having river gauges of the Kansas River and its tributaries.

The following warnings and predictions were issued by the weather bureau, viz: "May 26, 1903. Owing to the frequent rains in the Kaw and middle Missouri valleys the rivers will continue to rise at Kansas City. Should the rains keep up a few days longer the danger line will be reached."

"May 27, 1903. The rivers will continue rising at Kansas City."

"May 28, 1903. The great volume of water resulting from recent storms between Kansas City and Sioux City, and in the Kaw Valley, has raised the Missouri beyond danger line at Kansas City, the reading at 7 a. m. being 21.7 feet. While Sioux City and Omaha report falling stages, reports of very high water in the Kaw River, added to prospect of more rain in this section in the next twenty-four hours, suggest that interests affected by high water should be closely guarded."

"May 29, 1903. The Missouri River stage 23.3 feet at Kansas City

this morning, 2.3 feet above danger line. Excessive rain in past 24 hours in Kaw valley and light to moderate rains through Missouri basin. Both Missouri and Kaw will continue rising. The flood in the Kaw may become very serious without additional rains liable to fall today and tonight. It may go 2 or 3 feet higher in next 36 hours."

The following warning was prepared by the weather bureau on postal cards and mailed on same day to all points between St. Joseph and Boonville, Mo.: "Ordinary river stages are shown in Missouri from Plattsmouth northward, while below St. Joseph, the river is above the danger line, being quite serious at Kansas City. This flood is entirely due to frequent and excessive rains. The uncertainty of the rain outlook places the river changes beyond accurate calculation, and it would be well for all interested to be prepared for emergencies."

"May 30, 1903.    Stage of Missouri at 7 a. m. at Kansas City, 25 feet and still rising. This is more serious than the flood of 1892 and only about one foot below stage of 1881." The foregoing warning was prepared on postal cards and mailed to all points below Kansas City by the weather bureau. And Mr. Conner, who was then in charge of the United States Weather Bureau at Kansas City, testified this warning was amended for local use by every spark of intelligence which reached his office, but that its being a legal holiday no weather reports were received, and only vague reports from Kaw points, telegraphic communication being very poor.

"May 31 (Sunday).    No report of any kind received. This office absolutely in the dark as to what might happen. Cut off from telegraphic communication except east and northward, nothing could be said except what is actually happening in this vicinity. And still the rain keeps falling."

"June 1, 1903.    State of river at Kansas City at 7 a. m. 35 feet, a rise of 7.5 feet in 24 hours. At Plattsmouth 11.2 feet, rise of 0.2 feet; at Omaha 14.4, rise of 1.3 feet; at Sioux City 11.3, fall of 0.7 feet. No reports received from Kaw points."

The following special bulletin was issued June 1, at 11:30 a. m.: "The crest of the flood has probably been reached at Kansas City. It is now fluctuating below the 35 foot mark. The threatening and showery condition at present prevailing over the Kaw and middle Missouri watersheds may not be able to maintain the present high stage, so that a slight fall may be shown within twenty-four hours. This encouragement should be taken sparingly owing to unsettled weather conditions."

The flood was caused by one general rise which began on May 20, 1903, and continued a steady gradual rise from day to day until May 31; then during the next twenty-four hours occurred an enormous rise of seven and one-half feet, which was maintained from about 7 a. m. June 1, to about 6 p. m. June 2, after which there was a steady fall until the river receded in its banks. The height of this flood above the average stages attained during these months was about fourteen feet. The flood was thirty-five feet above zero, and 8.8 higher than any previous flood except the flood of 1844.

The reports and warnings of the flood above stated of the Weather Bureau, were issued and given to the public from day to day from the inception of the flood. While the Weather Bureau could not anticipate

the full extent of the flood and did not make predictions of the height it attained, defendant's agents at Kansas City had such information as it gave the public, and was published in the newspapers from the signal service.

This is a sufficient statement of the evidence to enable us to determine whether the court erred in giving the peremptory instruction complained of in the assignment of error.

It is an elementary principle of common law that a common carrier is liable as an insurer for the loss of goods intrusted to him for transportation, unless such loss was caused by the act of God, the public enemy, inherent defects in the goods or negligence on the part of the owner. When it is shown in a suit of this character that the goods were delivered to the carrier and were destroyed while in his possession, as was done in this case, a *prima facie* case is made out which can only be rebutted by the carrier's proving that the destruction of the goods was due to one of the causes above mentioned. (Gulf, C. & S. F. Ry. Co. v. Roberts, 85 S. W. Rep., 479, and authorities cited.) When such a *prima facie* case is made out, the burden is upon the carrier to prove that the goods were destroyed proximately by one or more of the causes, without any negligence of the carrier proximately contributing, which exempts him from liability. And, primarily, the question as to whether he has discharged this burden of proof by overturning the *prima facie* case is one of fact for a jury to determine. If the question of whether a *prima facie* case of the plaintiff's right to recover can, upon any rebutting evidence of the defendant, however strong, ever be withheld from the jury and decided by the court as one of law, it can only be when the evidence in rebuttal is so overwhelming as to leave no room for a reasonable doubt in the mind of every man of ordinary intelligence that the *prima facie* case has been destroyed by clear proof of an absolute defense to it.

If plaintiff's goods, while in defendant's possession for transportation, were without negligence on its part contributing thereto, destroyed by an unprecedented flood, then such destruction would be attributed to a *vis major,* or act of God, which would exempt defendant from liability, unless it could have, by the exercise of ordinary care, reasonably anticipated the occurrence of such a flood as would work such destruction and have kept plaintiff's goods from being subject to its ravages.

While what constitutes an act of God, such as will relieve a common carrier from its common-law liability, is ordinarily a question for the jury, whose members may be presumed to be better acquainted with and more capable of judging the consequences of such *acts* than members of courts, it will be assumed *pro hac vice* that the flood which destroyed plaintiff's goods was an act of God; for to say that it was not His act because as great a flood occurred at the same place in 1844 would be to hold that God is incapable of causing two floods of the same character at the same place.

This concession will leave for our consideration only the questions, whether the evidence is such as to convince every man of ordinary intelligence that the destruction of plaintiff's goods were proximately caused by the flood without any negligence on the part of the defendant proximately contributing thereto.

In a number of cases it has been decided that the negligent delay of the carrier in transportation could not be regarded as the proximate cause of an ultimate loss by a casualty which in itself constitutes an act of God, as the term is used in defining the carrier's exemption from liability, although had the goods been transported with reasonable diligence they would not have been subject to such casualty.   (Hunt v. Missouri, K. & T. Ry. Co., 74 S. W. Rep., 69; International & G. N. Ry. Co. v. Bergman, 64 S. W. Rep., 999; Gulf, C. & S. F. Ry. Co. v. Darby, 67 S. W. Rep., 129; Gulf, C. & S. F. Ry. v. North Texas Grain Co., 74 S. W. Rep., 567; Morrison v. Davis, 20 Pa., 171, 57 Am. Dec., 695; Denny v. New York Cent. R. Co. (Mass.), 74 Am. Dec., 645.)

On the other hand it has been held that the preceding negligent delay on the part of the carrier, in consequence of which the goods were overtaken by a flood, was sufficient ground for holding the carrier liable for the loss.   (Michaels v. New York Cent. Ry. Co., 30 N. Y., 564, 86 Am. Dec. 415; Read v. Spaulding, 30 N. Y., 630, 86 Am. Dec., 426; Wald v. Pittsburg, C. C. & St. L. R. Co., 162 Ill., 545, 44 N. E. Rep., 888, 35 Law Rep. Ann., 356.)

This conflict in the authorities is recognized by the text writers, some inclining to the first rule stated and others to the last.   As is seen from the authorities cited the courts of this State hold with the first.

While it may be conceded that mere negligence will not render one person liable to another for a loss which the latter would not have sustained had there been no such negligence, unless the negligence was the proximate cause of the loss; yet, on the other hand, it is well settled that if the negligence of one person with reference to the duty he owes to another concurs with an accidental cause resulting in injury to one to whom such duty is owed the negligent person must answer for the consequences as though his negligence were the sole cause of the loss.   (Gulf, C. & S. F. v. Boyce, 87 S. W. Rep., 397, and authorities cited; Moffatt Com. Co. v. Union Pac. Ry., 113 Mo. App., 544, 88 S. W. Rep., 117; Pinkerton v. Missouri Pac. Ry., 93 S. W. Rep., 849.)

The principle just stated is recognized by the decisions of this State as applicable to loss of goods by a common carrier caused by the act of God.   For in International & G. N. R. R. Co. v. Bergman, supra, it is said:  "Inasmuch as it is undisputed that the loss of the cotton was occasioned by the storm of September the 8th, 1900, and as the catastrophe comes within the strictest definition of the act of God, it will serve to acquit the company, unless it is made to appear that there is some causal connection recognized by the law between the negligence of the company in failing to make timely delivery of the goods and their destruction by the storm," clearly implying that if such causal connection were shown the defendant would not be relieved of liability by reason of the principle above enunciated.

It has been seen from our statement of the case that plaintiff pleaded that defendant was negligent in exposing his goods to the danger of the flood, because it had due notice of the probability of the flood, etc.

In Pinkerton v. Missouri Pac. Ry. Co., above cited (a case where the goods were lost by the same flood that plaintiff's in this case were) it was held "though the flood was an act of God, that to excuse the carrier, this act of God must be the sole cause of the loss or injury, and

whenever the negligence of the carrier mingles with the act of God, as a cooperating cause, he is liable provided the resulting loss is within the probable consequence of the negligent act; otherwise it would be too remote and disconnected to be considered the proximate cause"   .  .  .
The court, then, after stating the evidence, which is similar to that in this case, proceeded as follows: "We can not say, without an exercise of arbitrary authority and unwarranted power, that the entire evidence leaves defendant so clearly without fault as to deprive the plaintiff of a right to the opinion of the jury."   See also Green-Wheeler Shoe Co. v. Chicago, R. I. & P. Ry. Co. (Iowa), 106 N. W. Rep., 498; Wabash Ry. Co. v. Sharpe, 107 N. W. Rep. (Iowa), 758, which are also cases for damages to goods by the same flood.

Now, without discussing the evidence or intimating an opinion upon it, we are satisfied that it can not be said from it as a matter of law that the defendant, in view of the information it had in relation to the flood, was not guilty of such negligence in exposing plaintiff's goods to the danger of such flood which so concurred with the act of God in producing their destruction as to render it liable for the loss of their value.

Wherefore, the judgment of the District Court is reversed and the cause remanded.

                                        . *Reversed and remanded.*