ST. LOUIS SOUTHWESTERN RY. CO. OF TEXAS et al. v. HUGHSTON GRAIN CO. et al.   (No. 992.)

(Court of Civil Appeals of Texas. Amarillo. May 10, 1916. Rehearing Denied May 31, 1916.)

1. CARRIERS ⊜⟶177(1)—CONNECTING LINES—LIABILITY—THROUGH SHIPMENT.

Within Vernon's Sayles' Ann. Civ. St. 1914, art. 731, providing that all carriers over whose lines freight is received by either for through shipment by them, on a contract for through carriage, recognized, acquiesced in, or acted on by them, shall be considered connecting lines, with liability under article 732 for injury to the goods on either lines, where the S. company issues its bill of lading for a through shipment of a car of corn from a point on its line to a point on the line of the I. company for a through charge, the contract stating that it was executed by the S. company as agent with respect to the route beyond its line, and the I. company received and carried the goods to destination in the same car and without a new contract, but by virtue of the original contract, there was a through shipment.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 775, 778; Dec. Dig. ⊜⟶177(1).]

**2. CARRIERS ⬅132—INJURY TO FREIGHT—DEFENSES—BURDEN OF PROOF.**

The carrier has the burden of proof on its defense that damage to freight was caused by an unprecedented flood.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 578–582, 605; Dec. Dig. ⬅ 132.]

**3. CARRIERS ⬅135 — INJURY TO FREIGHT — MEASURE OF DAMAGES.**

The action being for injury to freight, and not conversion thereof, by the carrier, and the evidence showing it was rendered worthless, the measure of damages is the market value at time and place of tender.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 557–559, 599–602, 603½–604½; Dec. Dig. ⬅135.]

Appeal from Collin County Court; H. L. Davis, Judge.

Action by the Hughston Grain Company and others against the St. Louis Southwestern Railway Company of Texas and another. Judgment for plaintiffs, and defendants appeal. Affirmed.

Head, Dillard, Smith, Maxey & Head and J. F. Holt, all of Sherman, E. B. Perkins, of Dallas, and J. E. Abernathy, of McKinney, for appellants. J. D. Cottrell, of Plano, and John Doyle, of McKinney, for appellees.

HUFF, C. J. The appellees brought suit against the St. Louis Southwestern Railway Company of Texas, and the International & Great Northern Railway Company, for $521.05, and interest. Damages are alleged to have been sustained to a shipment of a car of corn. The case was tried before the court without a jury, and judgment rendered in favor of the appellees, against both defendants, for the sum of $559.10, with interest, with a judgment in favor of the St. Louis Southwestern Railway Company, over against the International & Great Northern for a like amount. From this judgment the appeal is prosecuted.

On the 15th day of November, 1913, the Tom Bean Grain Company, at Tom Bean, Grayson county, Tex., a station on the line of the St. Louis Southwestern Railway Company of Texas, designated as the "Cotton Belt," delivered a car of corn to that road, to be shipped and delivered at Eloise, Tex., a station on the International & Great Northern Railway Company, the bill of lading stipulating that notice was to be given to the Hughston Grain Company. This company had contracted to sell the car to Nash-Robinson & Co., who resided at Marlin, but directed the car to be delivered at Eloise, Tex. The Cotton Belt received the car at Tom Bean and issued its bill of lading for a through shipment. The Cotton Belt carried the car to Ft. Worth, and there delivered it to the International & Great Northern Railway Company in good condition. It was transported over the rest of the route by the latter road. It appears that the car was afterwards hauled into Marlin, and the trial court finds the corn was then in a worthless condition. There was no other bill of lading issued by the connecting carrier, but it is inferable that the shipment was taken through on the same bill, and freight paid without change of car. There is no other contract shown than the one executed by the initial carrier. The corn, when delivered to the initial carrier, was in good and merchantable condition, on November 15, 1913. When it was tendered to Nash-Robinson December 12 or 14th, it was worthless, and was not accepted by that company. The appellees were the owners, and under the contract to deliver merchantable corn retained the title thereto. The contract stipulates that:

The Cotton Belt agrees to safely deliver at its usual place of delivery at the destination, if on its road; otherwise, to deliver to another carrier on the route to destination. "In issuing this bill of lading this company agrees to transport only over its own line, and except as otherwise provided by law, acts only as agent with respect to the portion of the route beyond its own line. No carrier shall be liable for loss, damage or injury not occurring on its own road or its portion of the through route, nor after said property has been delivered to the next carrier, except as such liability is or may be imposed by law; but nothing contained in this bill of lading shall be deemed to exempt the initial carrier from any such liability so imposed.''

[1] The Cotton Belt, under its first and second assignments, asserts error in the findings of fact by the trial court, to the effect that the shipment was a through shipment, and to the conclusion of law that the shipment was a through one. In support of its propositions it cites Railway Co. v. Jones, 58 Tex. Civ. App. 132, 124 S. W. 194; Railway Co. v. Chittim, 135 S. W. 747; Elder, Dempster v. Railway Co., 105 Tex. 628, 154 S. W. 975; Railway Co. v. Grady, 171 S. W. 1019. In the Jones Case, supra, our Supreme Court (104 Tex. 96, 134 S. W. 330) held:

"To bring a contract * * * within the terms of article 331a, the contract entered into by the first carrier must be for carriage from the point of shipment to the destination, and the shipment must be received and carried by the connecting carriers under that contract.''

The evidence in that case shows that the cattle were unloaded at the intersection of the two roads and reloaded into other cars belonging to the connecting carrier. The latter road in that case did not recognize and accept under the original contract. The Supreme Court said, in that case, there must be something other than receiving the shipment because the law required it to do that. Mr. Justice Hawkins, speaking for the Supreme Court, in the Elder Case, supra, at page 648 of 105 Tex., at page 986, of 154 S. W., said:

"It will be observed that by its own express terms, as pointed out in the last-mentioned decision of this court, the effect of this statute is limited to cases in which there is a contract for through carriage which has been 'recognized, acquiesced in, or acted upon' by such connecting carriers. Now, when that status exists, there is

no reason for the application of the rule which was announced in the Baird Case, supra, and the cases following it. There is therefore no conflict whatever between said article 331a and 331b and those decisions."

These articles are now in Vernon's Sayles' Civil Statutes, arts. 731, 732. The decisions referred to by Mr. Justice Hawkins announce the proposition that the accepting carrier of the freight could not be held to have ratified the contract because it performs some of the services contemplated by it when it was not at liberty—contract or no contract—to refuse to render the service. If the facts in this case warrant the finding that the delivering carrier "recognized, acquiesced in, or acted upon" the contract, the stipulation that damages for which the Cotton Belt was liable should be confined to its own acts on its own road would be a through shipment in spite of limiting the damages to its own line. The statute expressly provided such contract is a through shipment, "notwithstanding any stipulation, or attempted stipulation, to the contrary by such carriers, or either of them." The mere receiving of the freight by the connecting line is not a ratification of the contract. In this case the connecting carrier, not only received the freight, but it did so without limitation or stipulation changing the contract in the least. It carried it forward in the same car to the place designated in the contract as the destination. This occurs to us as a recognition of the contract. It acted upon it. The bare receiving of the car did not make a prima facie case; but receiving and transporting to destination on its line of road, without any new arrangement or contract, as in the Jones Case, should be considered, we think, some evidence of recognition. It occurs to us that it recognized that there was no necessity for a new contract, and continued the shipment under the one made by the initial carrier. We do not clearly perceive the meaning of the clause in the contract in question under consideration—

"that this company agrees to transport only over its own line and except as otherwise provided, by law, acts only as agent, with respect to the portion of the route beyond its own line."

This clause excludes the idea, we think, that it was acting as the agent of the shipper over the route beyond its line, but implies that it was acting as the agent for that portion of the route. That portion belonged to the International & Great Northern and the Cotton Belt, therefore, acted as agent for the International & Great Northern. The statute stipulates, when the contract is recognized by either, they shall be construed to be connecting lines, "and be deemed and held to be the agents of each other, each the agent of the others and all the others the agent of each," and held to be under a contract with each other and the shipper for safe transportation. It seems to us this contract was made in view of the statute, thereby recognizing the rights of the carriers against each other

for any damages paid occasioned by the other. Under the common law, a carrier giving a bill of through shipment is not liable beyond its own line on the theory that it is not a common carrier beyond its own line, but the statute makes each a common carrier beyond its own line as to the shipper when they are the agents of each other. The Cotton Belt, by the contract, proposed to act for both, as principal on its own line and as agent beyond its line. Its ultimate liability should be confined to its own line, but as to the shipper, the law makes it liable as agent in the transportation over the entire route. The contract appears to recognize this as true by the clause "but nothing in this bill of lading shall be deemed to exempt initial carriers from any such liability so imposed." This is an intrastate shipment, and hence this clause cannot be construed as referring to interstate shipments under the act of Congress regulating interstate shipments.

"Without using the term 'partnership' to describe the relationship between connecting carriers, the same general consequences may result when a joint contract is found to exist. This may be evidenced by the making of an arrangement to carry freight over all their lines for one through charge, in solido, payable at the terminus, accompanied by a pledge collectively to give satisfaction. It has been said that wherever several connecting carriers associate themselves together and form a connecting line of common carriers, each being empowered to contract for freight, and passengers, for the whole line, and to receive pay for same, which is to be divided in prescribed portions, they are jointly liable for losses or injuries upon a part of the line. Where connecting carriers are not treated as partners and no express joint undertaking has been made by them, an agreement by one may be imputed to the other on the theory that the former was the agent of all to make a contract in reference to a shipment over their several lines. Where this has occurred, each may be held liable for any loss resulting from the failure of the other to perform the conditions imposed by the contract, and each is entitled to the benefit of all valid limitations of the carrier's liability contained in the contract." 4 R. C. L., Carriers, § 348.

To our mind it was the purpose of the statute to make the carriers with connecting lines liable, either jointly or separately, to the shipper for damage done on the route, where they are the agents of each other, notwithstanding a provision limiting the damages to the respective lines, and this agency should be considered prima facie established by the court where it is shown they recognized, acquiesced in, or acted upon the contract. It occurs to us that prior to this statute there was some confusion in the decisions as to the liability for the acts of carriers standing in the relation of agents. The evidence shows a charge was made for a through shipment, a bill issued over the entire line to the destination on the connecting lien. It was a bulk shipment, and a carload of corn. The car was carried through and the freight charges not changed. The shipment was carried by the connecting carrier to the destination without demanding its freight to be paid separate from the initial carrier and

without a different contract, but upon the same contract, in the same car, and by virtue of a contract stating it was executed by the initial carrier as the agent with respect to the route beyond its own line. It occurs to us Judge Phillips' discussion of a through shipment, and what it takes to constitute one, applies with force in this case, even though in that case that was a discussion as to an interstate shipment. Railway Co. v. Wood, 105 Tex. 178, 146 S. W. 538. The connecting carrier in this case does not seek a release because the contract was not made by or for it; but it is the initial carrier who made the contract purporting to act as agent, and expressly stipulating that nothing in the bill of lading should exempt it from the liability imposed by law that seeks to be relieved from its obligation. We believe the trial court ruled correctly under the facts and the contract introduced in this case, in holding the Cotton Belt liable and in giving it a judgment for any sum paid by it against the International & Great Northern Railway Company.

[2] It is also contended by both roads that the corn was damaged by an unprecedented flood, and therefore they are not liable. The trial court finds after the car was delivered to the International & Great Northern Railway it was submerged, and the corn practically destroyed, but that the flood was not an unprecedented one. If it shall be conceded that the witnesses testified to the flood of the Brazos river, and that it was unprecedented, the evidence does not show that in fact, while at its highest, the car was then in Eloise, and submerged by that particular flood. The facts do not show where the car was during that flood. The witness introduced never saw it in the flood or at that station. The flood appears to have been in December, 1913. The witness, some time about the 12th or 14th of December, saw the car at Marlin, some 15 miles from Eloise. He never saw it at the point claimed. This place appears to be situated on the Brazos river. Whether it was in the flood or not is not shown; in fact, there is nothing to show it was damaged by the overflow of the river. It occurs to us the defendants could have shown when the car was placed at that point, if it ever was. They evidently knew the train crew that handled the car. The witness who testified was at the time of testifying, county judge of the county. The car appears to have been on the road some 26 or 28 days. The testimony shows that it should have gone through in from 4 to 6 days. There is some conflict of authority, where there is negligent delay in shipments, and a flood or storm damages goods, as to whether the delay is the proximate cause of the injury. It appears to be the rule in this state that it is not. Hunt Bros. v. Railway, 74 S. W. 69; Railway Co. v. Bergman, 64 S.

W. 999; Fentiman v. Railway Co., 44 Tex. Civ. App. 455, 98 S. W. 939. If this car was in fact delivered at Eloise, no notice was given of its arrival at that place to the owner or consignee until after its damage. While the court finds the car was damaged by being submerged, he finds that it was not by an unprecedented flood. The case of appellant, if there is any, was that the car was at Eloise on the Brazos river, and on account of an unprecedented flood it was there submerged. There is no conclusive evidence that it was there during that rise. The witness testifying did not see it there. His testimony is but conjecture or pure hearsay. The burden was on the railroads to show it was so damaged. The court found they had proven a submergence, but not by an unprecedented flood. The car of corn, the findings of the court and the evidence show, was rotten or worthless on December 12th or 14th, at Marlin. From the evidence we cannot say with absolute certainty what caused it. The appellants did not prove what did. The court, from the witness' conjecture and his evident hearsay, could not say that the proof showed it was damaged by an unprecedented flood, and he did not so say. These facts were for the court, and, he having found against appellants, we do not feel warranted in disturbing the judgment.

[3] This is a suit for damages to the car of corn. The court found it was worthless at the time it was tendered to Robinson & Co., and rendered judgment for the market value of the corn at that time and place. This is not a suit for conversion, as contended by the appellant. We think the rule invoked by the International & Great Northern Railway is not therefore applicable to the pleadings and evidence as found by the trial court.

The case will be affirmed.