PENCE v. GALVESTON, H. & S. A. RY. CO. (No. 637.)

(Court of Civil Appeals of Texas. El Paso. Dec. 7, 1916. Rehearing Denied Jan. 5, 1917.)

1. RAILROADS ☞113(5)—MAINTENANCE—LIABILITY FOR INJURIES.

Under Rev. St. 1911, art. 6495, providing that a railroad shall not construct a roadbed without the necessary culverts or sluices, as the natural lay of the land requires, for the necessary drainage thereof, defendant railroad would be responsible to plaintiff in damages for destruction of his property by filling of the basement in his house with water if caused by defendant's failure to construct the proper culverts, or sluices, through its embankment, necessary to pass off surface water falling on higher grounds as it would have flowed but for obstruction.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 357; Dec. Dig. ☞113(5).]

2. RAILROADS ☞114(4)—MAINTENANCE—ACTIONS—EVIDENCE—SUFFICIENCY.

In action against a railroad for damages caused by the flooding of plaintiff's basement by surface water, collected and diverted from its natural course by defendant's elevated roadbed, evidence *held* sufficient to take the question of defendant's failure to provide proper culverts or sluices, as required by Rev. St. 1911, art. 6495, to jury.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 371; Dec. Dig. ☞114(4).]

3. RAILROADS ☞113(5)—CONSTRUCTION—LIABILITY FOR INJURIES.

As defendant railroad's liability to the plaintiff for damages suffered by flooding of his basement by surface water must be by reason of the failure of the defendant to construct proper culverts and sluices in accordance with Rev. St. 1911, art. 6495, it owed no duty to notify plaintiff that an opening had been washed out through its roadbed, or that the opening had been cribbed up, or that it intended to put a culvert under its roadbed at any point at any time.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 357; Dec. Dig. ☞113(5).]

4. RAILROADS ☞114(1)—MAINTENANCE—ACTION—PLEADING.

In an action against a railroad for damages caused by flooding of plaintiff's basement by surface water, allegations that the damage was sustained by reason of defendant's failure to construct necessary culverts under its elevated road-bed, thereby collecting and retaining water in such large quantities that it flowed through a culvert to plaintiff's house, filling his basement with water and caused damage, and that by construction of its elevated roadbed defendant interfered with the natural flow of rainfall causing the water to collect in large quantities instead of flowing off in its natural course, and that the waters were thus caught and caused to flow through a culvert under the roadbed in such quantity as to flood plaintiff's basement, causing damage, although indefinitely stated and confused by failure to separate the two counts and pleading of immaterial facts, were sufficient, in the absence of special exceptions, to state a failure of the duty enjoined by Rev. St. 1911, art. 6495.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 368; Dec. Dig. ☞114(1).]

Error from District Court, El Paso County; P. R. Price, Judge.

Suit by George Pence against the Galveston, Harrisburg & San Antonio Railway Company. Judgment for defendant, and plaintiff brings error. Reversed and remanded.

J. A. Buckler, of El Paso, for plaintiff in error. Beall, Kemp & Nagle, of El Paso, and Baker, Botts, Parker & Garwood, of Houston, for defendant in error.

WALTHALL, J. This suit was brought by George Pence against the Galveston, Harrisburg & San Antonio Railway Company, to recover damages alleged to have been sustained by him by reason of the company's failure to construct necessary culverts under its elevated roadbed and track, thereby collecting and retaining the waters that naturally flowed down to said roadbed, from the north side of its track in such large quantity that, when it reached a culvert placed under its said roadbed by the company, it flowed through said culvert and down to plaintiff's house, situated on the south side of said roadbed, filling his basement with water to the depth of several feet, thereby destroying certain merchandise stowed in said basement. Plaintiff alleged that by the construction of its elevated roadbed and tracks, it so interfered with the natural flow of the rainfall upon the higher ground on the north side as to cause the water to collect in large bodies on the north side of said roadbed, instead of flowing off in its natural course and spread itself over a large area of ground to the south and southeast of said track; that the waters were thus caught and retained by said elevated roadbed, and caused to flow into and through a culvert placed under its roadbed in such quantity that it flowed into his basement, causing the damage complained of. Defendant answered by general demurrer and general denial. The court heard the evidence and gave a peremptory instruction to the jury to find for the defendant. The only question presented on this appeal is the sufficiency of the evidence to take the case to the jury. The evidence amply shows that plaintiff sustained the damage alleged, and that it was caused by the water filling

---

his basement to the extent of several feet. On the issue as to the defendant's liability for the damage sustained, the evidence, in part, is as follows: The plaintiff testified in part:

"During the time I lived there, prior to that, there had never been any floods affecting my house. There was no difference in the location and elevation of the streets prior to that time and the time I lived there. * * * The next morning I went out to try to find out where the water came from, to find out what was the cause of it, and I followed the water up—there was still a lake of water there. I went across the street and found out where it came from. I found a cribbed-up condition of the Southern Pacific track, ties on either side the Galveston, Harrisburg & San Antonio track and I found the water had come through there. I don't know of any other place along the track up there where it could have come through. Yes; I found the culvert under the main line cribbed up. The cribbed-up culvert was a uniform size, cribbed up with ties, an opening of something less than the present opening, and it was probably 4 feet wide and 4 feet high or more. There is a permanent bridge there now, 10 or 12 feet long and about 4 feet high. I am familiar with the construction through that part of the town. * * * There is a network of tracks just at the west end of the El Paso & Southwestern tracks. They have a board fence across the end of their property there, and between that board fence and the brickyard there on Dallas street there is a network of various tracks; the main line of the Galveston, Harrisburg & San Antonio's track is laid on an elevated roadbed, beginning, say, 200 yards west of the culvert, or more; it is elevated more or less 4 feet higher than the land below it. I have known that part of defendant's road about 26 years. Yes, prior to this flood I had observed accumulated bodies of water on the north side of the track at various times, in fact, every time it comes a rain I noticed it there; it filled up the low places and stood there, and there was constantly water there during the rainy season, in more than in one place, in various places around the area where the tracks are. * * * The water came in quantity, and raised very rapidly around my house."

Photographs were introduced and plaintiff testified, explaining points shown in them. Testifying further, he said:

"Picture No. 5 shows the north side of the track, showing the conditions of the grades and the places that the water accumulates here between the various tracks, and shows the west end of the Southwestern shops, and the water runs towards that end of that fence; being the south end of that north and south fence, and from there all up in here is where the water accumulates, and shows the grade higher, and shows the low ground where the water is held. This culvert was within 20 or 30 feet of this El Paso & Southwestern fence."

The United States Weather Bureau report for the month was introduced, showing the greatest rainfall in 24 consecutive hours to be 2.06 inches.

Plaintiff, testifying further, said:

"I had lived down there five years prior to 1914. * * * During the time I lived there there had never been any floods over that land. * * * The main track was the same height ever since I have known it. * * * The natural drain in all this country is from the foothills toward the river. * * * There is no depression on the inside of my fence; it is about the same all along there. * * * I went out to that opening and it was cribbed up; a lot of water had passed through there, and the railroad section men had cribbed it up. I went out

to see some time in the forenoon of the next day. * * * I traced the source of the water to find out how it got in there. It came through that place. It ran to the cribbing, I found, on the north side of the track from town—I suppose from the streets in town. I saw where it came from the north side of the Galveston Harrisburg tracks. It came down Dallas street, the regular source; it is the regular drain there. I went up to Dallas street."

F. B. Stuart testified:

"Since I have been there (the Atlas Brick Company plant) I have noticed water standing north of the Galveston, Harrisburg & San Antonio track, immediately east of Dallas street, by our plant there. It extended up to the corner of the fence of the Southwestern yards. I have seen water standing there many times. I have seen it probably 3 feet deep there; I don't know exactly. It ran over the track there. The water comes down Dallas street there and runs around our plant, and runs over the Galveston, Harrisburg & San Antonio track and also the Southwestern track that connects the Southern Pacific with the Southwestern. I have seen it do that when the train is sufficient, when they have a flood in the northern part of the town. The water ran over the Galveston, Harrisburg & San Antonio track right in that immediate neighborhood."

Speaking in reference to a blueprint offered in evidence, the witness Stuart, after locating certain culverts in the track of the Southwestern, said:

"The Southwestern has a drainage under its tracks so the water would come down the Galveston, Harrisburg & San Antonio tracks. I have seen water come down here and run around over this track here, right here and here. I have seen this washed out so the trains could not pass over it. The trend of the water would be down this way; it could not come from this way I am quite sure."

Lee H. Orndorff, speaking of the Pence place, said:

"It was flooded last year by water from the north. It has been flooded three times since the culvert was put in over there. * * * That property has not been flooded for ten years prior to 1914, before this culvert was cut under the main track of the Galveston, Harrisburg & San Antonio. * * * That is a low part of town down there. If the railroad was not there, I think the water would run across the whole country. * * * If the railroad were not there, the water would go over the whole country. * * * The natural tendency is from the foothills to the river."

Article 6495, Revised Statutes 1911, provides:

"In no case shall any railroad * * * construct a roadbed without first constructing the necessary culverts or sluices, as the natural lay of the land requires, for the necessary drainage thereof."

[1] If the evidence quoted was sufficient to show, prima facie, the construction or maintenance by defendant of an embankment along its right of way constituting its roadbed, which obstructed the natural flow of the surface waters falling on the higher ground on the north side of its tracks and roadbed, and thereby caused to be diverted from its natural course, as the lay of the land on the north side requires and collected in such quantity from want of necessary culverts or sluices, as to break through its roadbed, or to flow through a culvert or

sluice constructed under its roadbed and to run down on the south side of its tracks in such volume as to fill plaintiff's basement and cause the injury complained of, the defendant would be liable in damages to plaintiff therefor. It has long been the law that if a railway company fails to construct the proper culverts, or sluices, necessary to pass off the surface water falling on higher grounds, in the direction the water would have flowed but for said embankment or obstruction, it is responsible for the damage incurred by such failure. G., C. & S. F. R. R. Co. v. Helsley, 62 Tex. 593; G., C. & S. F. R. R. Co. v. Holliday, 65 Tex. 512; Railway v. Donahoo, 59 Tex. 128; Railway v. Tait, 63 Tex. 223; G., H. & S. A. Ry. Co. v. Riggs, 107 S. W. 589; Fentiman v. A., T. & S. F. Ry. Co., 44 Tex. Civ. App. 455, 98 S. W. 939; Texas & Pacific Ry. Co. v. O'Mahoney, 50 S. W. 1049.

[2] We believe that the evidence quoted, and other evidence in the record somewhat similar but in different language, sufficient to require that the case be submitted to the jury on the facts suggested.

In view of another trial, we think it well to pass upon some features of appellant's cause of action as pleaded and insisted upon in this appeal.

[3] We are of the opinion that the defendant did not owe to plaintiff the duty of notifying plaintiff that an opening had been washed out through its roadbed, or that the opening had been cribbed up, or that defendant intended to put a culvert under its roadbed at any point at any time. If defendant was liable to plaintiff for any of the damages suffered, it must have been by reason of the failure to perform the duty enjoined upon it by the statute and authorities above quoted.

[4] Plaintiff's cause of action, whether under the statute, or independent of the statute, is rather indefinitely stated, and confused by not separating the two counts and by pleading immaterial facts, but we are inclined to think it sufficient, in the absence of special exceptions to state a failure to discharge the duty enjoined by the article of the statute quoted.

For reasons stated, the cause is reversed and remanded.