**FORT WORTH ELEVATORS CO. v. KEEL & SON et al. (No. 7892.)**

(Court of Civil Appeals of Texas. Galveston. April 1, 1921. Rehearing Denied April 28, 1921.)

**1. Sales ⬤⟹200(2)—Where wheat shipped consigned to shipper's order, title passes on the payment of draft attached to bill of lading and delivery of the bill of lading, though weighing at destination necessary.**

Where wheat is purchased and shipped by rail consigned to shipper's order, and drafts for the price are sent through banks, with bills of lading attached, and such drafts are paid by the purchaser, and bills of lading delivered to him, title passes to the purchaser, notwithstanding that the wheat must be measured or weighed at destination to definitely determine the exact sum to be paid for the entire mass.

**2. Carriers ⬤⟹88—Carrier relieved of liability for shipment on delivery to purchaser's agent.**

Where a seller of wheat shipped it by rail to his order, with a draft and bill of lading attached, and the carrier delivered it to a wharf company, which was the agent of the purchaser authorized to receive it, the carrier thereafter owed no legal duty relative to the protection of the wheat.

**3. Carriers ⬤⟹134—Wharves ⬤⟹20(7)—Evidence held to show proximate cause of loss of wheat due to act of God.**

In an action by a purchaser of two carloads of wheat brought against the seller, the carrier, and a wharf company, where it appeared that during a flood the wharf company hauled the cars into the yards of a railroad company, where they were destroyed by fire caused by the flood waters reaching an adjacent car of unslacked lime, the undisputed evidence *held* to show that the proximate cause of loss of the wheat was due to a storm properly classified as an act of God.

**4. Wharves ⬤⟹20(1)—Removal of wheat by wharf company to place where destroyed held remote and not proximate cause of loss.**

In an action by a purchaser of wheat against the seller, the carrier, and a wharf company for loss of the wheat by fire due to flood waters produced by a storm reaching a car of unslacked lime, where it appeared that the wharf company, after the wheat had been delivered to it, was forced to haul the cars to another point and to leave them in the yards of a third party where the loss occurred, the removal by the wharf company, if negligence, was the remote, and not the proximate, cause of the loss.

**5. Wharves ⬤⟹20(7) — Evidence sustaining finding that loss from storm could not have been prevented by defendant.**

In an action by a purchaser of two carloads of wheat against the seller, the carrier, and a wharf company to which it had been delivered, where it appeared that because of a storm flood waters gathered to a height forcing the wharf company to move the cars to a place where they were destroyed by fire, caused by water reaching unslacked lime, evidence *held* to support a finding that the damage by high water from the storm could not be prevented by the wharf company at a reasonable expense and without injury to others.

**6. Wharves ⬤⟹20(1)—Wharf company held not obligated to raise tracks above level of flood waters of previous storms to prevent injury to wheat delivered to it.**

In an action by a purchaser of wheat against the seller, the carrier, and a wharf company to which it had been delivered, for its loss by fire occurring through flood waters reaching a car of unslacked lime at a point to which the wharf company had been forced to move the cars in an effort to protect them, *held* that the wharf company could not be charged with anticipation of the severity of the storm, and was not obligated to go to great expense to raise its track beyond the level of flood waters of previous storms.

**7. Wharves ⬤⟹20(1)—Removal of wheat by wharf company to escape floods held not actionable negligence.**

In an action by a purchaser of wheat against a wharf company to which it had been delivered for its loss by fire caused by flood waters

reaching an adjacent car of unslacked lime in the yards of a third party, to which the wharf company had moved it to escape the floods, such removal *held* not under the evidence actionable negligence, it being made in good faith in the stress of grave and impending danger, and with the view of saving the property from injury.

Appeal from District Court, Galveston County; Robt. G. Street, Judge.

Action by the Fort Worth Elevators Company against Keel & Son and others. Judgment for defendants, and plaintiff appeals. Affirmed.

Maco & Minor Stewart, of Galveston, Albert J. De Lange, of Houston, and Jules Damiani and W. N. Zinn, both of Galveston, for appellant.

James B. & Charles J. Stubbs, of Galveston, and Davis & Davis, of Gainesville, for appellee Keel & Son.

Lee, Lomax, Wren & Smith, of Fort Worth, for appellee Gulf, C. & S. F. Ry. Co.

Terry, Cavin & Mills, of Galveston, and Thompson, Knight, Baker & Harris, and Geo. S. Wright, all of Dallas, for appellee Wharf Co.

LANE, J. This suit was brought by appellant, Fort Worth Elevators Company, on the 19th day of December, 1916, against J. Z. Keel and W. L. Keel, parties composing the firm of Keel & Son, the Gulf, Colorado & Santa Fé Railroad Company, hereinafter referred to as the Santa Fé Company, and the Galveston Wharf Company, hereinafter called the Wharf Company, to recover the sum of $2,364.53, the value of two cars of wheat. The plaintiff in its original petition, in effect, alleged:

That on the 6th day of August, 1915, it and the defendants Keel & Son entered into a contract whereby the latter agreed to sell and deliver to the former at Galveston, Tex., for export, two cars of No. 2 bulk wheat, containing 1,000 bushels each, for which the purchaser agreed to pay the seller $1.20½ per bushel, or a gross sum of $2,410, less $45.47 unpaid freight charges from Gainesville, Tex., to Galveston, Tex.; that it was the understanding and agreement of the contracting parties that the weight and grades of the wheat as ascertained at Galveston should govern in the final settlement between said parties, and that the contract of sale and purchase should not be complete until all of the wheat had arrived at Galveston for export, and had been inspected, weighed, and accepted by the purchaser; that thereafter in due time Keel & Son, the sellers, did deliver the two cars of wheat to the Santa Fé Railroad Company, to be by said company transported to Galveston and to be there delivered to the purchaser, Fort Worth Elevators Company, and that the Santa Fé Company executed and delivered to Keel & Son a bill of lading for each of said cars of wheat, showing that each contained 1,000 bushels, that said bills of lading contained a stipulation that the wheat should be delivered to shippers' order, notify the Fort Worth Elevators Company; that such bills of lading with drafts attached thereto for the purchase price of the wheat were sent to the Fort Wort Elevators Company by Keel & Son on the 7th day of August, 1915, and that they were received by the Fort Worth Elevators Company at Fort Worth, Tex., on the 7th day of August, 1915, and that said drafts were paid in full, less the sum of $45.47, part of the freight charges, the net sum so paid being $2,364.53, that being the sum which the purchaser had contracted to pay Keel & Son for the wheat; that the sum so paid was the reasonable market value of the wheat at Galveston at the time of the conversion thereof by the defendants.

"That said payments aforesaid were made to the shipper because the plaintiff relied absolutely and implicitly upon the correctness of said drafts and bills of lading and upon the agreement of the defendant shipper and the obligation of the defendant railway company to deliver to the plaintiff at Galveston, Tex., the quality and quantity of wheat contracted for, and that such payments were made in accordance with the custom prevailing in the grain trade of the state of Texas and the custom commonly used by and between the plaintiff and the shipper; that the said bills of lading and each of them were properly indorsed by the shipper, and that the plaintiff, upon the payment of the drafts attached to such bills of lading, and upon procuring possession of such bills of lading, became the owner and holder thereof, and that it is now, and has been at all times since the payment of the aforesaid drafts, the owner and holder of said bills of lading, and of each of them, and the defendant railway company became thereby bound to deliver the grain as described in said bill of lading to the plaintiff at Galveston, Tex., for export."

That it was well known to all the defendants that said wheat was intended for export to points without the United States by water from Galveston; that the defendant Wharf Company, as well as the Santa Fé Company, was a common carrier and public transportation company, maintaining lines of railroad and transportation facilities connected with the line of railway of the Santa Fé Company, terminating at the water's edge at the port of Galveston, and connected with an elevator owned, maintained, and operated by said Wharf Company.

"That the railway had no facilities at Galveston for the delivery of grain and in contracting to so deliver said grain for export said railway bound and obligated itself to arrange for some connecting line at Galveston to be by it selected for the exchange of said grain from the line of said railway to an elevator necessary to handle said grain; or from cars to shipside

for export, and plaintiffs allege upon information and belief and assert it to be a fact that the railway company by some arrangement, the terms of which are unknown to the plaintiff, *delivered the said grain to the Wharf Company for delivery to plaintiff at ship's side or in the elevator of said Wharf Company, and that the said Wharf Company accepted and received such grain for such delivery to the plaintiff.* (Italics ours.)

"That plaintiff has no knowledge of the facts, if any, as to what disposition was made of said grain after delivery was made by the said shipper to defendant railway, other than the conflicting claims made by defendant railway and defendant wharf company to plaintiff as to the whereabouts of such grain, the truth concerning such shipment of said grain being wholly within the knowledge of the defendant railway and the Wharf Company, both of said defendants knowing all the facts concerning the same, and none of said facts being known to plaintiff. Defendant railway advised plaintiff that said grain was delivered to said Wharf Company, which latter company contends that said grain was not delivered to it by said railway company, but that it was retained by the said railway, and plaintiff had made demand upon said shipper, railway, and said Wharf Company for delivery of said grain in accordance with the terms of said contract and bill of lading, but said defendants have failed and refused, and still fail and refuse, to deliver same to plaintiffs, but have converted said grain to their own use or to the use of one or the other of them, the facts of such conversion being wholly within the knowledge of defendants and not at this time known to the plaintiff.

"That the said railway has converted said grain to its own use, and, pleading in the alternative, plaintiff says that if said railway has not converted same, then in that event said railway did deliver same to the Wharf Company, which latter company converted same to its own use; that defendant shipper by reason of the obligation to deliver said grain to plaintiff at Galveston, Tex., under its contract with the plaintiff, is jointly and severally bound with said railway company and said Wharf Company, and with each of them, to deliver said grain at Galveston, Tex., to plaintiff, but that each and all of the defendants have failed and refused to deliver such grain to the plaintiff, although demand has ofttimes been made therefor, on each and every one of them; that by reason of the failure and refusal of the defendants and each of them to deliver said grain to the plaintiff, the plaintiff has thereby been damaged in the sum of $2,364.53, together with interest thereon from the 7th day of August, 1915, until paid, at the rate of 6 per cent. per annum and all costs herein incurred."

Prayer was for judgment against all the defendants for the sum of $2,364.53, and interest thereon from August 7, 1915.

Keel & Son answered plaintiff's complaint by general denial and by special pleading that—

"On August 6, 1915, by contract with the plaintiff over the telephone, they sold to the plaintiff for shipment during that week 3,000 bushels of bulk wheat, basis No. 2, for the price of $1.20½ per bushel cash, payable upon the loading of said wheat for shipment to Galveston, Tex., which wheat was to be delivered to plaintiff at Galveston and in the final settlement Galveston official weights and grades were to govern; that in compliance with said contract, defendants, on August 7, 1915, at Gainesville, Tex., delivered to the defendant railway company 3,000 bushels of No. 2 wheat, which was loaded in three cars of said railway company, each car containing 1,000 bushels, and for the usual customary freight charges, said railway company agreed and undertook to transport said three cars of wheat from Gainesville to Galveston, and there deliver them to the order of defendants."

They then alleged the drawing of the drafts as alleged by plaintiff, and the payment thereof by plaintiff. They further alleged that by the payment of the drafts attached to the bill of lading plaintiff became the owner of and entitled to possession of the wheat; that the bills of lading specified that the plaintiff was to be notified at Galveston of the arrival of the wheat at that point; that one of the cars of wheat sold by them to the plaintiff, under the contract by which the two cars in controversy were also sold, arrived at Galveston on the 9th day of August, 1915, and was inspected and received by the plaintiff on the said day. The other two cars, being the ones mentioned in the petition, arrived at Galveston on August 13, 1915, and were inspected and accepted by the plaintiff, but were afterwards, on August 16, 1915, destroyed by fire while in the yards of either said railway or other railroad company or Wharf Company; said two burned cars contained each 1,000 bushels of No. 2 wheat, fully complying with said contract, and the plaintiff was promptly and instantly notified by said railway company of the arrival of said wheat.

They allege that said two cars of wheat were the property of plaintiff upon its arrival at Galveston and had been its property since loaded at Gainesville for shipment, and that it was so treated by plaintiff, and that plaintiff is now suing as the owner thereof.

"That while Galveston official weights and grades were to control in the final settlement, the property passed to the plaintiff regardless of such weights or grades, which merely determined whether the plaintiff would be owing defendants anything additional or whether the plaintiff would have any claim against these defendants for shortage in weight or grade."

Keel & Son also filed their cross-bill against the other defendants, and alleged that the wheat was destroyed by fire at Galveston while in possession of the Santa Fé Company, but in view of the disposition we shall make of this appeal, in so far as it affects them, we deem it unnecessary to further refer to the pleading setting up their cross-action.

The defendant Gulf, Colorado & Santa Fé Railroad Company answered: First, by gen-

eral denial; second, that if it be found that it did receive the wheat under the contract of shipment as alleged by the plaintiff, then it says that it did transport and deliver the same at Galveston under said contract, and did comply with all its obligations under said contract, in that it did transport said wheat with reasonable dispatch to Galveston, and there after due notice deliver the same to the plaintiff, but that if it should be held that said wheat was in its possession as a common carrier at the time of its loss, and that it had not been legally delivered to the plaintiff, and that this defendant had not complied with all its obligations with reference to said wheat, and that its possession and control of said shipment had not terminated, then it says that said shipment was damaged and destroyed by the unprecedented storm and flood of August 16, 1915, which occurred at Galveston; that such storm and flood were of such unprecedented violence and character that it, or its action and consequence, could not have been anticipated, or its consequences averted by the performance of any duty defendant owed to plaintiff, and that the loss of said wheat and its value was due to such unprecedented storm and flood without any fault or negligence of defendant, and that such storm and flood was and were an act of God, for the consequences of which the defendant cannot be held liable; third, that if it be found that it undertook to transport said wheat as alleged by plaintiff, and that under such undertaking it failed to make delivery to the plaintiff as alleged, then it says that the bill of lading upon which said shipment was made provided that no carrier or party in possession of said·shipment should be liable for any loss of same, or damage thereto, caused by the act of God. This defendant alleged further as follows:

"That the shipments in question were interstate or foreign shipments, controlled by the laws of the United States, Statutes of Congress, and the decisions of the United States courts, and this defendant says that not only at common law is it not liable for the damages alleged, but it is not liable by virtue of said provision in the bill of lading referred to above, and under the laws and decisions of the United States courts. That the question of this defendant's liability in this case is in all things governed by the United States laws and decisions."

The defendant Wharf Company answered: First, by general denial; second by specially denying that the wheat in controversy was ever delivered to it; third, that if said wheat was ever delivered to it, it received the same, not as a common carrier, but as a warehouseman only, without any knowledge or information as to the ultimate destination thereof, and that it received and held said wheat as such warehouseman in accordance with the orders of the owner, thereafter to be given, etc. It then alleges the damage and destruction of the wheat by the unprecedent-ed storm and flood of August 16, 1915, as the act of God, as did the defendant Santa Fé Company.

By supplemental petition, filed on the 19th day of May, 1919, the plaintiff denied generally the allegations of the defendants, Santa Fé and Wharf Companies, and says that it was not advised as to the facts concerning the loss or destruction of the wheat in controversy, that such facts are wholly within the knowledge of said defendants, and that if said wheat was destroyed as alleged by defendants' it was by reason of their fault and negligence.

By supplemental answer both the defendants Santa Fé Company and the Wharf Company denied the allegations of the plaintiff's supplemental petition, and, further replying to same, say: That the pleadings of plaintiff show that the negligence charged occurred more than two years prior to the setting up of any cause of action based upon the negligence charged, and therefore such cause of action so based was barred by the two-year statute of limitation at the time said supplemental petition was filed.

After the trial of the case had begun the plaintiff filed its trial amendment reading as follows:

"(1) The allegations herein are not set up as a cause of action on which recovery is sought, but in reply to and in avoidance of the attempt by defendants to escape liability by showing the loss through the act of God.

"(2) The wheat in controversy was delivered to defendant Gulf, Colorado & Santa Fé Railway Company, which issued its bill of lading therefor, and plaintiff seeks recovery thereunder, said Gulf, Colorado & Santa Fé Railway Company being the initial carrier, and at all times liable—defendant Galveston Wharf Company if it received said wheat and had same in its possession, as is sought to be shown by the Gulf, Colorado & Santa Fé Railway Company, did receive and hold same as a common carrier.

"(3) Defendants, Gulf, Colorado & Santa Fé Railway Company and Galveston Wharf Company, on this trial have introduced evidence by which they seek to show the wheat in controversy was destroyed in a fire occurring in a railroad yard other than that of either of said defendants. If they do so show, then plaintiff says such loss was not by act of God without the negligence of defendants, but, on the contrary, said defendants and each of them were guilty of negligence in their method of handling and in their placing of said wheat, such handling and placing being exclusively in the knowledge of defendants, who themselves and through their servants and agents so handled and placed said wheat, and plaintiff is not informed on the subject.

"(4) Among the acts of negligence of defendants and each of them concurring with any act of God that may be attempted to be proven plaintiff asserts the following:

"(a) Defendants and each of them failed to place said wheat above the reach of flood waters as to the height of which they had full knowledge in advance.

"(b) Defendants and each of them maintained their tracks and yards at such low level above mean low tide as that same was not a safe place over which to transfer and on which to handle and place said wheat.

"(c) Defendants and each of them removed said grain from the B yard near the elevator of defendant Galveston Wharf Company, and placed same on low ground where defendants and each of them knew, or by the use of reasonable diligence could and should have known, the wheat would be destroyed.

"(d) Defendants and each of them placed said wheat at some point unknown to plaintiff, but known to defendants where said wheat came in contact or in such close proximity to inflammable materials as to result in the loss and destruction thereof.

"(e) Defendants and each of them failed to place said wheat above the danger of flood waters, though informed of the danger in sufficient time to have done so.

"(f) Defendant Gulf, Colorado & Santa Fé Railway Company together with others so constructed a causeway across Galveston Bay as to raise the height of the waters on Galveston Island, thereby making it necessary for said company to have raised its own yards and tracks.

"(g) Defendants and neither of them notified consignee of plaintiff of the arrival of the wheat within a reasonable time.

"(h) Defendants themselves placed or permitted to be placed combustibles, after notice of the approach of the storm, in such way as to bring about the loss."

After addressing special exceptions to each paragraph of said trial amendment, the defendants Santa Fé Company and Wharf Company filed answers, denying each and every allegation in said trial amendment contained, and pleaded the two-year statute of limitation in bar of any recovery based upon the acts of negligence for the first time set up in said trial amendment.

In an effort to condense, as much as possible, the allegations of 13 separate pleadings filed by the several parties, covering 52 pages of the record, we have made the foregoing statement, believing that it contains the substance of all material allegations in the pleadings, and is sufficient for the presentation of the issues presented by this appeal.

There were demurrers and many special exceptions filed by the several defendants addressed to the pleas of the plaintiff to which we have not referred in the statement made, for the reason that all such demurrers and exceptions were overruled by the court, and no attack is made upon such ruling on this appeal.

J. Z. Keel, of the firm of Keel & Son, was called as a witness by plaintiff, Fort Worth Elevators Company, and testified that on the evening of the 5th day of August, 1915, he had a talk over the phone with Jules Smith, representative of the Fort Worth Elevators Company, he being at Gainesville, Tex., and Mr. Smith at Fort Worth, Tex.; that by that talk he sold Mr. Smith for his company 3,000 bushels of wheat at $1.20½ per bushel, delivered at Galveston, Tex.; that he confirmed such sale by letter, the material parts of which are as follows:

"Gainesville, Texas, Aug. 6, 1915.

"Fort Worth Elev. Co., Fort Worth, Texas— Dear Sirs: As per phone talk, your Mr. Jules Smith and our Mr. J. Z. Keel, beg to confirm sale to you of 3,000 bus bulk wheat, hard, soft or mixed wheat, @ $1.20½ bu. del. Galveston for shipment this week, usual Galveston official weights and grades to govern settlement. * * *

"Truly yours,      Keel & Son, by H. B. K."

That on the same day on which the above letter was written Keel & Son delivered to the Gulf, Colorado & Santa Fé Railroad Company the two cars of wheat now in controversy for shipment to Galveston, Tex., for which said Santa Fé issued its two bills of lading, by which it contracted to transport said two cars from Gainesville. Tex., to Galveston, Tex., and there deliver same to the order of Keel & Son; that on the same day Keel & Son indorsed said bills of lading in blank and attached thereto two drafts reading as follows:

"Gainesville, Texas, Aug. 6, 1915. 191.

"On demand pay to the order of the Lindsay National Bank, Gainesville, Texas, $1,180.00, eleven hundred eighty-one and °°/₁₀₀ dollars in current funds.

"Keel & Son, by J. M. Kemplin. 175.

"To Fort Worth Elev. Co. Fort Worth, Texas."

"Gainesville, Texas, Aug. 7, 1915. 191.

"On demand pay to the order of the Lindsay National Bank, Gainesville, Texas, $1,183.53, eleven hundred eighty-three and ⁵³/₁₀₀ dollars in current funds.

"Keel & Son, by H. B. Keel. 177.

"To Fort Worth Elevators Co. Fort Worth, Texas."

That these bills of lading and drafts were on the 7th day of August, 1915, presented to the Fort Worth Elevators Company by the Fort Worth National Bank, and that the drafts were on said date fully paid by the Fort Worth Elevator Company, and upon such payments the bills of lading and drafts were delivered to said Elevator Company; that on the 6th day of August. 1915, Keel & Son received from the Fort Worth Elevators Company the following letter:

"Aug. 6, 1915.

"Messrs. Keel & Son, Gainesville, Texas— Gentlemen: We confirm purchase from you last night of three cars basis #2 wheat $1.20½ delivered Galveston, which business we are glad to have done with you.

"Yours very truly,
                "The Fort Worth Elevators Co."

And that Keel & Son also received from said Elevator Company the following instrument (the date of receipt not shown):

"Fort Worth, Texas, 8/6/15.

"Keel & Son, Gainesville, Texas. This confirms purchase from you to-day, by (phone) per J. G. S. to Mr. Keel 3 cars ——— bushels #2 wheat (basis) at 120½ per bu. basis delivered Galv. export for shipment this week To be billed O/N the Ft. Worth Elvs. Co. and routed Galveston, Tex. Galveston weights and grades shall govern in final settlement on this contract and a 3¢ bu. margin shall be left to guarantee same. Inspection, trackage (if any) and exchange charges to be paid by shipper.

"To insure payment of drafts, always immediately advise shipment, rendering separate invoice on each car, giving car number and initial, number of pounds, bushels, bags or bales, point of origin and destination.

"It is understood, when designation grades and weights are to determine final settlement, that the grades and weight of commodities herein contracted for shall be determined either at point of inspection or final unloading point, at option of the Fort Worth Elevators Co.

"We reserve the right without further notice, to extend the time of shipment, or cancel the contract or buy for shippers account, if for any reason any portion of the herein contracted goods are not shipped within contract time.

"It is further agreed that this contract is not complete until all shipments made to apply herein have arrived at destination and have been inspected, weighed and accepted.

"We will not pay exchange on drafts drawn against us at sight or on demand, nor will we honor drafts when exchange is added in invoice or amount of draft.

"Send all papers to us at Fort Worth, and drafts to Farmers' & Mechanics' Nat. Bank.

"It is also agreed and understood that this confirmation is a part of the contract, and its receipt, without objection or notification to us at once of error herein, shall be understood by us as an acknowledgment and acceptance of the contract as set forth above.

"The Fort Worth Elevators Co.
"Per R. M. Kelso."

Testifying further, the witness said:

"The trade was made over the telephone on the evening of the 5th, and they sent us what they call their confirmation. We did not make any reply to that, but I sent them a confirmation. We did not receive this confirmation from them before we shipped out this carload of wheat; we shipped the carload of wheat on the 6th, before we received this contract. I don't know whether we received it before we shipped the next two cars; I don't know when this was received; I didn't see it."

Testifying further he said that he paid no attention to the terms of the instrument above set out, purporting to state terms of the sale contract; that he paid no attention to the terms of this paper, because the only contract his firm had with the said Elevator Company was oral. The foregoing testimony was in no way disputed.

The undisputed evidence shows that the Fort Worth Elevators Company made arrangements with the Wharf Company to handle its grain coming into Galveston for the year 1914 and for 1915; that the grain was to be handled through the Wharf Company's elevators, and that under such arrangements the Wharf Company had handled such business during the years 1914 and 1915; that the Santa Fé Company had been informed of the aforesaid arrangement between the Elevators Company and the Wharf Company, and that it did, on the 10th of July, 1915, receive a letter from the manager of the Wharf Company, again informing it that the Wharf Company would handle, through its elevators "A" and "B," grain for the Fort Worth Elevators Company; that it was understood by the arrangement made that whenever cars containing grain came into Galveston under order notify Fort Worth Elevators Company the railroad companies, including the Santa Fé, would give notice to the Wharf Company on behalf of the Fort Worth Elevators Company of the arrival of such cars, and then deliver them to the Wharf Company; that the two cars were brought into Galveston by the Santa Fé Company on the 12th day of August, 1915, and that on the 13th day of the same month they were, in accordance with the general agreement between the Santa Fé Company and the Wharf Company, placed on the elevator "B" track, of the Wharf Company at or about Twenty-Ninth street, and in about 300 feet of its elevator "B"; that the Santa Fé Company notified the Wharf Company by letter on the same day that the two cars in controversy had arrived, and that the same had been ordered to the elevators of the Wharf Company as per its request; that at the time these cars were delivered to the Wharf Company the storm that struck Galveston on the 16th day of August, 1915, had been reported in the Gulf, and the United States Weather Bureau had issued storm warnings at Galveston; that the "B" yard of the Wharf Company at Twenty-Ninth street is at an elevation of about 6½ feet above mean low tide, and that the floor of a car placed in said yard would be about 10½ feet above mean low tide; that the storm waters in the storm of August 16, 1915, at Galveston, reached a total height of about 12 to 13 feet in the "B" yard at Twenty-Ninth street.

It was shown that on the morning of the 15th of August, 1915, at 8 a. m., the wind had a velocity of 7 miles an hour from the north; at noon it had increased to 13 miles northeast, and at 8 p. m. it was 20 miles an hour northeast. At midnight on the 15th it was still 20 miles, but had backed to the north. On the 16th at 1:45 a. m. it changed to the northeast, and was blowing 30 miles at 2:30 a. m.; 35 miles at 6 a. m.; 40 miles at 9:30 a. m.; 45 at 11:20 a. m.; 50 miles at 12:35 p. m.; 55 miles at 1:17 p. m.; 60 miles at 3:05 p. m.; 65 miles at 3:50 p. m.; 70 miles at 6:42 p. m., and it continued to blow 70 miles or over until 4 a. m. of the 17th. At 9:57 p. m.

the maximum of wind on the 16th occurred, 85 miles from the northeast, with an extreme volocity of 110 miles. The maximum during the storm occurred at 2.37 a. m. on the 17th; 93 miles east, with an extreme velocity of 120 miles at 2:30 a. m.

It was shown that about 10 a. m. of the 16th the superintendent of the Wharf Company tried to get in touch with the railroad officials so as to get permission to pass over their main lines with a view to hauling cars of wheat, then on its tracks, across the causeway over the bay to the mainland, but that he failed to get in communication with said officials, and that at about 1 a. m. he directed the employés of the Wharf Company in charge of the switch engines of his company to hitch onto said cars of wheat and start with them to the mainland; that said employés did hitch onto 59 cars of said wheat, including the 2 cars in controversy, and started to haul them to the main land, but when they got to Fifty-First street the railroad track was so obstructed by the storm waters that it was impossible for them to proceed further; and then, learning that the mainland could not be reached, they undertook to return with their train of cars to the "B" yards of the Wharf Company, from whence the cars had been taken, but again the fury of the storm and the flood waters caused thereby frustrated their plans, and they were forced to back the cars of wheat, including those in controversy, into the yards of the Trinity & Brazos Valley, known as the Valley yards.

It was shown that there was a car of unslacked lime in the Valley yards close to where the two cars in controversy were placed, and that the rising waters, driven by the wind of the hurricane, entered the car of lime and produced a fire, which spread to the two cars of wheat and destroyed them and their contents.

It was shown that none of the agents, officers, or employé of the Wharf Company knew of the existence of said car of lime, or had any reason to suspect that it was in the yard. In other words, we think the evidence shows that after the Wharf Company was advised of the probable intensity or force of the hurricane it made every reasonable effort to take plaintiff's wheat to the mainland, and that in being frustrated in so doing it had it placed in the safest place which could be reached.

It was also shown that the point in the Valley yards where this wheat was placed was about the same elevation above low mean tide as was the point from which it was taken in the "B" yards, and that such damages as would have resulted from high water alone would have been practically the same in each of said yards.

It was shown that on the 8th day of September, 1900, a violent hurricane struck Galveston Island, and that it resulted in the drowning of 8,000 to 10,000 people, the destruction of thousands of houses, and of various kinds of property of the value of hundreds of thousands of dollars. It was shown that hurricanes of considerable violence had struck the Gulf coast of Texas in the years 1875, 1886, 1900, and 1909, and that none of them except the one of 1900 did any great damage to life or property in the city of Galveston. It was shown that the hurricane of 1900 was the most severe and disastrous storm that had ever struck the Texas coast up to the hurricane of 1915. It was shown, however, that the hurricane of 1915 lasted much longer than that of 1900, and that as a result thereof the flood waters on the bay front, along the wharves, and in the vicinity of all railway yards on the island, were from 2 to 3 feet higher than they were in 1900. It was shown that after the 1900 storm and before the storm of 1909 the people ·of Galveston with the aid of the state of Texas, constructed a sea wall about 17 feet in height, along the Gulf coast, beginning at the extreme northeastern part of the island and extending southwestwardly around the city of Galveston for 5 miles or more, which it was thought would protect the city against material damage from storms of the intensity of that of 1900, should such storms again occur. Evidencing the faith the people of Galveston had in the sea wall as a protection against future storms, Lewis Fisher, mayor of Galveston, and other prominent citizens of Galveston, signed, published and caused to be sent broadcast the following circular:

"Galveston Tribune, July 23, 1909.
"Editorial, Volume 1, Page 12.
"The Sea Wall Does Its Work.

"Galveston's famous sea wall has had its first severe test and has done the thing it was built to do. It has turned back the assaults of the storm-driven sea upon the low sand island from a second grave disaster.

"The greetings sent out to the world by the leading citizens of Galveston will not only allay present fear for those now on the island, but will strengthen the confidence felt by the world in the ability of the engineers to make the Island City permanently safe from the sea.

"The greeting follows:
"The city of Galveston sends greetings to her sister cities, the people of the United States, and of the world, in that in this hour it has just passed through a most formidable storm, manifesting in its course some of the most violent incidents of cyclonic disturbances, and its great sea wall has completely vindicated its efficiency and protected the city against dangers from the sea, leaving such insignificant damages as are incident to all storms. The city's great business interest and its people have safely passed through a most severe hurricane, the sea wall proved a complete success, the city's great wharves and shipping interests suffered no damage, and not a life was lost on the island."

The faith of the people in the sea wall as an absolute protection, as expressed in the foregoing circular, however, was shattered by the unprecedented storm of 1915, which caused the flood waters to reach a height of 2 to 3 feet above those of the storm of 1900 in the railway yards.

There was evidence amply sufficient to sustain a finding that neither the Santa Fé Company nor the Wharf Company could have raised their railroad tracks to such heights as would have prevented damage to the plaintiff's wheat from the flood waters of the hurricane of 1915 at a 'reasonable cost and expense, and without injury to property of others.

The cause being tried before a jury the court instructed a verdict for the defendants Keel & Son, and submitted the following special issues:

"(1) Would the hurricane of 1915 have been reasonably anticipated by a person of ordinary prudence in the position of the defendants? Answer Yes or No.

"(2) Could damage by high water from the hurricane of 1915 have been provided against by the defendants at a reasonable expense and without injury to others? Answer Yes or No."

To the first question the jury answered "Yes" and to the second "No," and they also found in favor of Keel & Son as instructed by the court.

Upon the verdict of the jury and the evidence the court rendered judgment in favor of the defendants. From such judgment the Fort Worth Elevators Company has appealed.

[1] By the first assignment of error appellant insists that the court erred in instructing a verdict for Keel & Son. Its contention is that Keel & Son had contracted to deliver the wheat to it in Galveston; that said wheat had not been delivered to the Fort Worth Elevators Company at the time of its destruction, and hence title thereto had not passed to said company. There is no merit in this contention. The facts hereinbefore stated clearly show that the wheat had been delivered to appellant's agent at Galveston, and that the ownership thereof had passed from Keel & Son to appellant.

Where goods are purchased and are shipped by rail, consigned to shipper's order, and drafts for the price are sent through banks with bill of lading attached, and such drafts are paid by the purchaser and bills of lading delivered to purchaser, title to such goods passes to the purchaser. Where the entire shipment is sold and paid for, as in this case, but must be measured or weighed at destination, with a view of definitely determining the exact sum to be paid for the entire mass, the title passes to the purchaser, notwithstanding the necessity of such measurement or weighing. Robinson & Martin v. Houston & Tex. Cent. R. Co., 105 Tex. 185,

146 S. W. 537; Boaz & Co. v. Schneider & Davis, 69 Tex. 128, 6 S. W. 402. This proposition is, we think, too well settled to require citation of other authorities.

By assignments 2 to 7, inclusive, it is insisted: First, that the answer of the jury to special issue No. 2 is unsupported by any evidence, and is contrary to all of the evidence, in that the evidence is undisputed and conclusive that the Santa Fé Company and the Wharf Company could have raised a sufficient number of their respective tracks to accommodate all loaded cars in their possession to such height as would have placed cars standing thereon above the storm waters of the storm of 1915, without injury to the rights or property of others; second, that the submission of special issue No. 2 was error, in that the jury should have been asked whether a person of ordinary prudence in the position of the defendants would have raised the tracks above high water, and whether such raise could have been accomplished without material injury to others; third, that the court erred in not rendering judgment for the plaintiff on the answer of the jury to special issue No. 1, because defendants were carriers and are liable to plaintiff for having failed to comply with their contract to deliver the cars of wheat to plaintiff at Galveston, and because defendants as carriers are liable as insurers; and, fourth, that the court erred in excluding the testimony of A. P. Hall to the effect that subsequent to the storm of 1915 the Santa Fé Company had raised a portion of its railroad tracks in the city of Galveston, at a cost of approximately $40,000 to $50,000 to such height that the bottom of cars standing thereon would be above the heights reached by the storm waters of the storm of 1915, and that there was no reason why the remaining portion could not be so raised, for the reason that such testimony was admissible on the question of the practicability and reasonableness of cost of such improvements.

[2] In so far as these assignments, or any of them, relate to the cause of action alleged against the Gulf, Colorado & Santa Fé Railway Company they are overruled. We have reached the conclusion, as before stated, that the uncontroverted and undisputed evidence showed that the Santa Fé Company received the two cars of wheat at Gainesville, Tex., for transportation to Galveston, Tex., to be there delivered to the plaintiff; that it did so transport said wheat, and that it did deliver same to the Wharf Company at Galveston, for the plaintiff, in accordance with the general contract and agreement then existing between the plaintiff and the Wharf Company, and between the Wharf Company, as the authorized agent of plaintiff, and the Santa Fé Company. The undertaking of the Santa Fé Company relative to these cars of wheat as a carrier had been promptly and fully performed. The

wheat had been delivered by the Santa Fé Company to the Wharf Company, which had been directed by the Elevator Company to receive the same at Galveston, several days before the storm reached Galveston and before it was destroyed. It is therefore clearly apparent that the questions of whether the Santa Fé Company should have anticipated the approach of the storm of 1915, or as to whether it could have raised its railroad tracks so as to place cars standing thereon above the reach of the storm waters of the storm of 1915, with reasonable expense and without injury to others, or as to whether it could have reasonably foreseen that the wheat standing in the "B" yards would have been damaged from the rising waters, were not material or pertinent inquiries in view of the facts found by us. The Santa Fé Company owed the plaintiff no legal duty relative to the wheat in controversy after it had delivered the same to the Wharf Company, the agent of the plaintiff authorized to receive the same at. Galveston.

Having disposed of the assignment relating to the liability of Keel & Son, and having also considered and disposed of assignments 2 to 7, inclusive, in so far as they relate to the liability of the Santa Fé Company, we now come ·to consider said assignments as they relate to the Galveston Wharf Company.

[3, 4] The jury found that the storm of 1915 would have been reasonably anticipated by a person of ordinary prudence in the position of the defendants. We think this finding, in the light of all the facts and circumstances, must be construed as a finding only that the defendants should have anticipated that a storm of more or less violence would probably strike Galveston as it did in 1915, and not as a finding that they should have anticipated a storm of the violence and duration of that of 1915, a storm of much longer duration than that of 1900, which up to that time was by far the most violent storm that had ever visited Galveston, nor as a finding that they should have further anticipated, notwithstanding the seawall, that the storm of 1915 would cause flood waters to rise to the unprecedented heights of 12 to 13 feet above mean low tide in the railway yards and along the wharf front as it did, the same being a height of about 2 or 3 feet greater than reached by the flood waters of the disastrous storm of 1900. Notwithstanding, however, the finding of the jury to special issue No. 1, we have reached the conclusion from the undisputed evidence that the proximate cause of the loss of the wheat in controversy was the storm of 1915, and that said storm is properly classed as an act of God, and that the defendant Wharf Company is not liable therefor. While it must be conceded that had plaintiff's wheat been left on "B" track it would not have been wholly lost, and that its removal from said yard to the Valley yards and its being placed and left close to a car of unslacked lime concurred with the storm in producing the loss, and while but for said removal the total loss would not have been suffered, still such removal, even if it could be said to be negligence on the part of the Wharf Company, was the remote and not the proximate cause of such loss. We think the law as declared in Barnet v. Railway Co., 222 N. Y. 195, 118 N. E. 625, Bergman v. Railway Co., 64 S. W. 999, G., C. & S. F. Ry. Co. v. Darby, 28 Tex. Civ. App. 229, 67 S. W. 129, Hunt v. Railway Co., 74 S. W. 69, G., C. & S. F. Ry. Co. v. Texas Flour Mills, 143 S. W. 1179, G., H. & S. A. Ry. Co. v. Crier, 45 Tex. Civ. App. 434, 100 S. W. 1177, Wells Fargo & Co. Express v. Porter, 202 S. W. ·987, and Fentiman v. Railway Co., 44 Tex. Civ. App. 455, 98 S. W. 939, is applicable to the facts of the present case, and acquits the Wharf Company from any liability for the loss of plaintiff's wheat.

[5] However, a further discussion of the scope and import of the inquiry of the court as propounded by special issue No. 1 and as to what the jury intended to find by their answer thereto becomes immaterial in view of the finding of the jury in answer to special issue No. 2. To this issue the jury answered in effect that the damage by high water from the storm of 1915 could not have been provided against by the defendant at a reasonable expense and without injury to others. This answer was amply supported by evidence. After much testimony as to the extent of the raising of almost the entire southern part of the city of Galveston lying along the Gulf coast to a height of from 6 to 8 feet since the storm of 1900, thus preventing storm waters from flowing south or east, had been heard, Mr A. D. Dickey, a civil engineer of long experience, testified as follows:

"It would be impracticable from an engineering standpoint to raise the level of the railroad tracks and yards that we have been discussing so that the storm level of 1915 would not enter box cars, unless some arrangements could be made to raise the grade of almost the entire city south of these railroad yards. It could not be accomplished satisfactorily by any system of drainage in my judgment."

Again:

"If you raise these yards out there, and the storm water in time of storms was sufficiently high to come over the embankments, it would wash out great gullies and would damage property immediately adjacent to railroad yards. The water would then be up as high as grade of your tracks on yards and would extend back over the city to same level. It would raise water all over the city. In case of storm the more embankments you would put out there the higher water you would have in the city, and the longer it would take water to recede, and the longer it would stay in city. In addition to that, it would be very difficult to take care of drainage from the south towards the

north and towards the bay. It would be a very difficult engineering problem.

"As to raising the tracks out yonder, the whole side of the town was raised and the drainage all thrown towards the bay. So the raising of the tracks out there did not interfere with the drainage, because it was all taken care of at the same time. It would have been a very difficult proposition if you had undertaken to raise these railroad tracks round there and carry it in on the embankment. It would have been an entirely different proposition."

Independent, however, of the finding of the jury that the tracks of the defendants could not have been raised so as to have placed cars standing thereon above the heights reached by the storm water of 1915, there is, we think, a controlling reason why the judgment rendered in favor of the Wharf Company should be affirmed. The undisputed evidence shows that the loss of plaintiff's wheat was caused by the storm of 1915, an act of God, and not by reason of any negligent act of the Wharf Company. In the case of G., C. & S. F. Ry. Co. v. Flour Mills Co., supra, it is said:

"The occurrences which have been held in some of the cases to be acts of God are spoken of as unprecedented, but it is manifest that an occurrence need not be unprecedented in the literal sense of that word in order to be regarded as an act of God. Any definition of the term which includes the idea that it must be an occurrence the like of which has never happened before would so restrict the application of the rule as to practically abrogate it. Under such a definition, a tidal wave, an earthquake, a volcanic eruption, or a storm, it matters not how violent or destructive such disturbance might be, would not be an act of God, unless it was more violent than any of like kind that had preceded it. It goes without saying that this is not the rule. All that is required in this regard to make an occurrence of this kind an act of God is to show that it was so unusual that it could not have been reasonably expected or provided against."

And in Fentiman v. Railway Co., 44 Tex. Civ. App 455, 98 S. W. 939, it is said:

"The flood which destroyed plaintiff's goods was an act of God; to say that it was not His act because as great a flood occurred at the same place in 1844 would be to hold that God is incapable of causing two floods of the same character in the same place."

It is shown that the citizens of Galveston during the period between the great storm of 1900 and the one of 1915 were so confident that their properties situated in the business portion of said city were free from flood waters that they made no changes in the levels of their buildings in which were stored large stores of food, clothing, and other properties of the value of millions of dollars; that these business men were of experience, not men of only ordinary skill and judgment, but of large business capacity and prudence; that they lived, invested their money, and kept their properties in the business portion of Galveston, where the waters reached a height of about 6 or 7 feet in the storm of 1915, with a feeling of safety, inspired no doubt with the thought that it was not probable that there would be a recurrence of a storm of the severity of the one of 1900, and that, should such possibly recur, the great sea wall would protect them, their families, and their properties. How, then, can it be held that a failure of the Wharf Company to build its tracks above the heights reached by the storm of 1915 was negligence, as that term is understood in law? What act did the defendant do to endanger or neglect to do for the protection of property in its possession that a person of ordinary prudence situated as it was would or would not have done?

Under the decisions quoted from above and those cited, the courts have held that the storm of 1900, the smaller storm of 1909, and the greatest storm of history on the Gulf coast in August, 1915, were acts of God and of such nature that man was not legally charged with the duty of anticipating their occurrence, and not answerable in damages proximately caused by such storms or hurricanes.

[6] Under these decisions we feel constrained to hold that this defendant was not charged with the duty of anticipating the severity of the storm of 1915, and was not obligated to go to the great expense of undertaking to raise its tracks on the "B" yard or on any other part of its property beyond the level of the flood waters of the storms of 1900 and 1915. A holding of the court that this defendant was charged with such duty would do violence to the decisions of the courts of this state.

[7] Appellant insists by its ninth assignment that the court erred in not instructing a verdict for it, in that the undisputed evidence shows that the Wharf Company removed the wheat in controversy from its "B" yard and placed same in the Valley yards, over which it had no control; that it was there destroyed by fire by reason of being placed near a car containing unslacked lime, which was set on fire by the storm waters coming in contact with the unslacked lime, and that if said wheat had not been so removed from "B" track it would not have been destroyed. This contention cannot be sustained. The undisputed evidence shows that as soon as it became apparent to the officials of the Wharf Company that the wheat might be damaged by the storm they did everything within their power to protect the same; that they attempted to move the wheat to the mainland, and, upon being frustrated in this attempt by the storm, they then tried to get it back to the "B" yards, and were again frustrated, and as a last resort they placed the cars containing the

wheat in the Valley yard, where there happened to be located a car of unslacked lime, which was later ignited, and from which the fire spread to and burned the two cars of wheat in controversy. We find as a matter of law that the removal shown by the evidence was not an act of actionable negligence. Such removal was made in good faith, in the stress of a grave and impending danger, and with the view of saving said property from injury.

As we have heretofore shown, even if it should be said that it was negligence upon the part of the Galveston Wharf Company to move the cars of grain from the "B" yards to the Valley yards, under the circumstances there could be no liability against the Wharf Company by reason of such movement, because under the law the Wharf Company could not be charged with the damage to said grain by the storm waters and the lime fire, as the proximate result of such movement of the cars. If these cars of grain had been permitted to stand upon the tracks of the "B" yards, the damage to the grain by water would have been practically the same as the damage by water in the Valley yards.

The additional damage by fire caused by the lime was not the probable and natural result of the placing of the cars in the Valley yards. The defendant could not have reasonably anticipated that the damage by fire would result when the cars were placed in those yards.

We have considered all of the assignments, and in view of our conclusion that the loss of appellant's wheat was due to the act of God, as hereinbefore expressed, we think it useless to prolong this opinion by a further discussion of other matters complained of by assignments 2 to 7, inclusive, or by the remaining assignments.

The judgment is affirmed.

Affirmed.

---

⊗➾For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes